## THE ATTORNEY GENERAL vs. THE WEST WISCONSIN RAILWAY COMPANY.

RAILROADS: CHARTER. (1–3) *Charter of defendant company construed, as to location of southern terminus.* (4) *Power given by its charter to change location of road does not include power to change termini.* (5) *Effect of act authorizing extension of road.* (6) *Power to change termini under general railroad law, considered.* (7, 8) *Charter a contract with state; duty of company to maintain and operate its road. Ch.* 31 *of* 1873. (9) *Forfeiture of charter by breach of duty.*

1. Under chapter 243, Laws of 1863, the defendant company was chartered as the "Tomah & Lake St. Croix Railroad Company," to build a road between the two terminal points named in said title, being a part of the land-grant road originally located by the La Crosse & Milwaukee R. R. Co.; and so much of the land grant as was applicable to the construction of such road from Tomah to Lake St. Croix, was resumed by the legislature from the La Crosse & Milwaukee Company, and bestowed upon defendant; and the road which defendant was to build is several times designated in sec. 14 of said charter, as a road from Tomah to Lake St. Croix. By the terms of sec. 5, defendant was authorized to locate, construct and operate a railroad "from such point as the directors should determine in the town of Tomah, in the county of Monroe, *or* on the track of the Milwaukee & La Crosse Railroad, or of any other railway running out of Tomah," to a point on Lake St. Croix. *Held,*

The Attorney General vs. The West Wisconsin Railway Company.

(1) That if the language of sec. 5 as to the southern terminus of the road be construed literally, there is a positive contradiction between it and sec. 14.

(2) That in view of the whole tenor of the act, the first "or" in sec. 5 must be construed as having a *copulative* and not a disjunctive force; and as requiring the southern terminus of defendant's road to be in the town of Tomah *and* on the track of some other railroad running out of that town.

2. Ch. 232, Laws of 1865, makes a further grant of land to defendant "for the purpose of aiding the construction of a road from the town of Tomah * * to the St. Croix river or lake," and confirms the former grant made to the company "to aid in the building of *said railroad*." *Held*, that this is a legislative construction of the charter, or operated as an amendment of the description in sec. 5, if such amendment was necessary.

3. At some time after its organization (apparently in 1866) defendant located its southern terminus on the line of the La Crosse & Milwaukee Railroad, in the town of Tomah. *Held*, that, this location being a valid one, the point so selected became and remained the fixed terminal point of the road, as much as if it had been specifically designated as such in the charter.

4. The original charter authorized the company to locate, and change the location of, its road, "on such route as it should think proper" between the terminal points named; but this gave it no power to change the termini themselves.

5. Defendant constructed its road from the southern terminus above described, northward through Warren's Mills, etc., to St. Croix, and received from the state the land grant, as provided, for every twenty miles so built, including some ten miles from the southern terminus to Warren's Mills. Ch. 516, Laws of 1870, authorized it "to extend the line of said road to the south line of this state." The board of directors then *passed a resolution* to extend the line of its road along the line of the La Crosse & Milwaukee road to Camp Douglas, and thence southwardly to Elroy in this state, the actual terminus of the road of another company leading from Chicago. Thereupon the defendant built the road from Camp Douglas to Elroy, intending to make a temporary arrangement for the use of the La Crosse & Milwaukee road from Tomah to Camp Douglas, and ultimately to build its own road between those points; but, said arrangement soon failing, it altered and straightened the line of its road so as to run direct from Warren's Mills to Camp Douglas, and discontinued and took up its road from the former place to Tomah. *Held*,

(1) That the power to extend its road southward to the state line

could be exercised only by building a road continuously from the fixed terminal point at Tomah.

(2) That a mere *resolution* to extend the road from Tomah southward was not an exercise of the power.

(3) That as there never was an actual extension of the road southward from Tomah, so as to acquire a new southern terminus for such road at Elroy, defendant could not straighten its road between Warren's Mills and Elroy, under any power to change the "location" or the "route," given by sec. 5 of the original charter, nor under the power conferred by sec. 23 of the general railroad act of 1872.

(4) That even if the road were extended southwardly as contemplated by the act of 1870, such extension would still be *accessory* to the principal road, whose southern terminus is fixed by the charter at Tomah.

[6. The power to change the "route" of its road, conferred by the act of 1872 on each railroad company organized under it, is a power to change it *between* the terminal points specified in the patent, and not to change the termini themselves; and it is matter of doubt whether such change can involve a change of the *counties* specified in the articles of association.]

7. Defendant's charter, being granted in perpetuity, and being a contract *upon a consideration proceeding from the state to the corporation*, is binding in perpetuity, unless sooner determined by law; and until the law governing it is changed, defendant cannot evade the duty of maintaining and operating its road, without breach of contract.

8. The road (from Warren's Mills to Tomah) which defendant is required by ch. 31, Laws of 1873, to relay and equip, is part of its chartered road, which it had built and was bound to maintain.

9. Defendant's act in discontinuing and taking up its road from Tomah to Warren's Mills, is such an offense against the provisions of its charter, and such a violation of public law, as works a forfeiture under R S., ch. 160, sec. 4, subds. 1 and 2.

10. A demurrer to defendant's answer was sustained on the grounds above stated, and leave given defendant to answer over to the information by the first day of next term.

Action in the nature of *quo warranto*, commenced in this court in August, 1873, by the attorney general, on leave granted by the court, to have a forfeiture of defendant's charter adjudged, and the corporation dissolved. A decision of the court upon a demurrer to the complaint will be found reported in 34 Wis., 197–217; and reference is made to that report for a some-

what full statement of the complaint. After its demurrer was overruled, defendant filed an answer, which, in addition to a general denial, alleged in substance the following facts: By ch. 516, P. & L. Laws of 1870, the legislature of this state amended defendant's charter so as to authorize the company to extend its railroad to the south line of this state. The amendment was accepted by the company, and on the first of September, 1871, the board of directors, being expressly authorized thereunto by the stockholders, duly adopted a resolution extending the line of defendant's railway from Tomah to the south line of this state, and also adopted a resolution instructing D. A. Baldwin, the president of the company, "to cause immediately the line of said extended road to be surveyed and finally located," from Tomah, upon the most direct and feasible route to Elroy, in the county of Juneau, in this state, and to proceed with the immediate construction of said road as far as Elroy, "and to cause the said extended line to be surveyed and finally located" from Elroy to the south line of the state at the earliest practicable period. Pursuant to the instructions of the board, the president of the company caused seven or eight lines to be run by competent locating engineers, with a view to extending said line of road from Tomah to Elroy by the most direct and feasible route; and said engineers, by reason of the character of the country between the two points, were unable to find a proper and practicable route between them, except by running for twelve or thirteen miles parallel with the Milwaukee & St. Paul Railway (formerly the La Crosse & Milwaukee Railroad), a road running out of Tomah; and it was ascertained that a railroad could not be constructed in a direct, or even tolerably direct, route southerly from Tomah to Elroy without an expense of near a million of dollars in tunneling alone, and without such grades as to render the road, if constructed, "difficult of operation without constant, burdensome, permanent and extraordinary expense and delays." Thereupon "the said extended line of road was surveyed and finally located" from

Tomah along and parallel with the Milwaukee & St. Paul Railway to Camp Douglas, a station on said last named road, and from thence in a southerly direction to Elroy, "which location and line was the only possible and practicable one from Tomah to Elroy;" and was duly adopted by the defendant company. Immediately thereafter, defendant condemned "the portions of the right of way needed for said extended railway" between Camp Douglas and Elroy, and proceeded immediately with the construction of said road thereon, and made the embankment and prepared it for the iron track, at an expense of about $130,000. This location was made in perfect good faith, with the intention of constructing the road thereon; and negotiations were immediately entered upon for the temporary use, under contract, of the track of the Milwaukee & St. Paul Railway between Tomah and Camp Douglas; and it was understood by the officers of the defendant company that said negotiations had resulted in the consent of the officers of the Milwaukee & St. Paul Company to the use of their said track by defendant until the succeeding spring; and for this reason defendant duly resolved to postpone the construction of that portion of its said road lying between Tomah and Camp Douglas until said succeeding spring, to wit, the spring of 1873, and to construct immediately only that portion lying between Camp Douglas and Elroy. Afterwards, in July, 1872, defendant ascertained that it would be impossible to make the arrangement above stated with the Milwaukee & St. Paul Company, for the use of its track, except upon terms which would defeat the successful operation of defendant's road during the time it was using said track; and it therefore became necessary for defendant to construct immediately "the whole of its said extended line of road." The line of said road "so surveyed and finally located and partially constructed and operated" from Warren's Mills to Elroy, by way of Tomah and Camp Douglas, was circuitous, extremely crooked and indirect, and some miles further than a direct line from Warren's Mills to Elroy by way

of Camp Douglas. Accordingly, at a meeting of the board of directors duly held on the 5th of August, 1872, the following preamble and resolutions were adopted, more than two-thirds of the whole board voting therefor : " *Whereas*, the *West Wisconsin Railway Company* has extended, as authorized by ch. 516 of the private and local laws of the state of Wisconsin for the year 1870, its railway from the village of Tomah, in Monroe county, in said state, to the village of Elroy, in the county of Juneau, by way of Camp Douglas on the Milwaukee & St. Paul Railway ; and *whereas*, the portion of its route from Warren's to Camp Douglas is extremely and unnecessarily crooked ; and *whereas*, it appears to the directors of the company that said portion of the line or route of said rail-way will be materially straightened and improved by altering the same as surveyed and partially constructed and in operation, so as to run direct from Warren's to Camp Douglas aforesaid : therefore, *resolved*, that for the purpose of straightening and improving the line of the West Wisconsin Railway, that portion thereof located and partially constructed and operated between Warren's Station and Camp Douglas on the Milwaukee & St. Paul Railway be, and the same is hereby, changed and altered, so as to run direct from said Warren's to said Camp Douglas, as shown by the map hereto annexed." A copy of said preamble and resolutions, with the map therein referred to, was duly certified and filed in the office of the clerk of the circuit court of the proper county on the 8th of November, 1872. A copy of the same map is also made a part of the answer ; and it is averred that the line of said road was greatly improved and straightened, and the distance between Warren's Mills and Camp Douglas and Elroy materially lessened by the alterations so made. Under the resolution above recited the line of said road as changed was duly located, and the location duly adopted, so as to run in an air line from Warren's Mills to Camp Douglas, and the road so altered was constructed in good faith at a

necessary cost of about $380,000. The cost of the road from Tomah to Camp Douglas, as located before said change, would have been $125,000. After the construction of said altered line of road, defendant took and removed the ties and the iron rails from that portion of its road lying between Warren's Mills and the village of Tomah, and laid the same upon the altered line of said road from Warren's Mills to Camp Douglas, and ran its rolling stock thereon, and has since operated the same as a part of the main line of its railway, and has not used the embankment lying between Warren's Mills and Tomah. Defendant built no new road and removed no iron and ties from any of its road during the year 1872, except as hereinbefore stated. Defendant's railway never extended into the *village* of Tomah; and that village never extended any aid to the road. Long prior to the aforesaid alteration in its line, defendant had constructed its whole road to the city of Hudson, and had received patents from this state and the United States for all lands enuring to it under the acts of congress of June 3, 1856, and May 5, 1864, and the acts of the state legislature above mentioned. Said change in the line of its road made a more direct line between Madison and Portage and the termination of defendant's road at Hudson. And defendant denies that it has in any manner violated the provisions of its charter, or of any law of the state applicable to and binding upon said company.

The answer contained various other allegations, tending to show that the relaying of its track between Warren's Mills and Tomah, and the operation of a road between those places, would be expensive to and oppressive upon the defendant, and would not be warranted by the business which could be done thereon; and that the village of Tomah was otherwise supplied with ample railroad facilities. It further set forth the facts relative to the execution of a trust deed upon the defendant's property and franchises, in pursuance of authority granted by

the legislature, and insisted that the trustees named in the deed were necessary parties to the action.

The plaintiff demurred to the answer as not stating a defense.

*H. L. Palmer*, of counsel with the attorney general: *

I. The complaint states a case under R. S., ch. 160, sec. 4. 1. Defendant changed the terminus of its road from Tomah to Camp Douglas, and abandoned that part of its road, as originally located and constructed, extending from Tomah to Warren's Mills, without authority from the legislature. (a.) There is nothing in its charter to authorize such change or abandonment. The southern terminus of the road having been duly established, as authorized by sec. 5 of the charter, in the town of Tomah, there was no provision in the charter for changing such terminus. The only authority given the company to locate, construct, alter, or operate a railroad, is expressly limited to a road extending "from such point as the directors shall determine in the town of Tomah," etc., "to such point on Lake St. Croix, between townships 25 and 31, as the directors shall determine." The whole power conferred was limited to some line between these two points. (b.) Ch. 58, Laws of 1859, in force when defendant's charter was granted, prohibits railroad companies from taking up or removing any part of their tracks, except under certain circumstances, and contains a proviso that the act " shall not be construed so as to prevent such company * * from straightening or changing their track, such alteration not to change the general line of the established track, or discommode the original termini or stations." It may be claimed that this act was repealed by ch. 119 of 1872. Sec. 56 of the latter expressly repeals sixteen entire chapters, and

---

* *Mr. Palmer's* brief was prepared and reported as a part of the argument on defendant's demurrer to the complaint (34 Wis., 204); but that demurrer having been treated merely as one to the jurisdiction, so much of the argument then made as is pertinent to the present demurrer, is here reported more fully.— REP.

one section of another chapter, of the general laws; but ch. 58 of 1859 is not among these. The prohibition contained in it against changing the original termini of railroads is not repealed by the act of 1872, unless by implication; and it will not be held by this court to be impliedly repealed, "if both acts may consist together." *Att'y Gen'l v. Brown*, 1 Wis., 513, and cases there cited. But the two statutes, so far as they affect the right to change the established termini of railroads, may well stand together. The words "route of their road," in the law of 1872, have reference only to the course or direction of an existing road, between established termini; and the words " any part of their road" refer to the track and roadbed along the route or course authorized to be changed. Any other construction of the language would lead to absurd consequences. A railroad company would have the right to change both termini of its road, and construct and operate an entirely different road, between entirely different points from those authorized by its charter. (c.) But if the several acts of the legislature are to be so construed as, by their terms, to confer upon the defendant power to change the terminus of its road from Tomah to Camp Douglas, then it is insisted that it was incompetent for the legislature of Wisconsin, without the consent of congress, to grant any such power. Counsel here recited various provisions in the acts of congress granting the lands to the state, and in the acts of the state legislature in conferring the grant upon the defendant company, and argued that the lands were granted and accepted in trust for the construction of a road from Tomah to Lake St. Croix, and that it was not in the power of the legislature to dispose of the lands except in strict conformity with the trust. 2. If the acts of defendant in changing its terminus and abandoning a part of its road as originally constructed, were done without legislative authority, they constitute such an offense against the provisions of its charter, and of the several acts of the legislature affecting the company, as will support this action under sec. 4, ch. 160, R. S.

II. A complete case for the relief here sought is made by ch. 31, Laws of 1873, if that is a valid enactment. And sec. 1, art. I of the constitution of this state, which relates to corporations "without banking powers or privileges," expressly authorizes such legislation, by providing that "all general laws or special acts enacted under the provisions of this section, may be altered or repealed by the legislature at any time after their passage." Where an absolute power to alter, annul or repeal acts of incorporation has been reserved to the legislature, the power to repeal is unqualified. 1 Am. Law Rev., 451 ; *Miller v. The State*, 15 Wall., 478, 488 : *Penn. College Cases*, 13 id.; 190, 213 ; *Olcott v. Supervisors*, 16 id., 678, 694 ; *Sherman v. Smith*, 1 Black, 587 ; *Agricultural Branch R. R. Co. v. Winchester*, 13 Allen, 29 ; *Comm. v. Eastern R. R. Co.*, 103 Mass., 254 ; *Nazro v. Merchants' Mut. Ins. Co.*, 14 Wis., 295 ; *Chapin v. Crusen*, 31 id., 209, 215 ; *Att'y Gen'l v. R. R. Cos.*, 35 id., 425.

*L. S. Dixon*, of counsel with the attorney general, contended : 1. That sec. 5 of defendant's charter did not authorize a change of terminal points; that it fixed both the termini of the road within certain limits, subject to the discretionary power vested in the board of directors to determine the particular points, within those limits, from which the road should start, and at which it should end ; and such power having been exercised, the terminal points fixed and road built between them, the authority of the directors in this behalf was exhausted ; that the termini were thus definitely and finally fixed *by the legislature* through the action and determination of the directors specially authorized for that purpose ; that this is confirmed by the language of the act of congress of May 5, 1864, and by that of sec. 1, ch. 232 of 1865 ; and that the power to " alter, change the location of, reconstruct," etc., given by the charter, is only a power to make such changes in a road between two fixed termini. 2. That the power given the directors of railroads by the general railroad law (sec. 23, ch. 119, Laws of 1872), upon a vote of two-thirds of their whole

number, " to alter or change the route or any part of the route of their road, if it shall appear to them that the line can be improved thereby," does not include a power to alter the terminal points of the road and to destroy its identity.  It is an *improvement* of " the line " as constructed, and not its destruction and the creation of a different line.   The line of a company's road, as constructed, is an ascertained, definable thing, having a certain place of beginning and ending.  Cut loose from terminal points in the interpretation of this statute, and we shall have no " lines " of railroads in this state, but only rows " of magic shadow shapes that come and go ;" dissolving views of roads that run in any and every direction, or none at all, at the caprice of boards of directors.  3. That the provision of sec. 3, ch. 516, P. & L. Laws of 1870, which authorizes the company " to extend the line of said road to the south line of this state," refers to " the line " of road then built and in operation from Lake St. Croix to Tomah.  To " extend " the line of that road as authorized is obviously not to build a new line from Lake St. Croix, or any place north of Tomah, to the state line, but to prolong or continue the line referred to as an existing integral line.  Webster's Dic., " Extend."  And when the legislature authorized extending the line of said road, certainly an *actual* and not a mere *paper* extension was intended.  Looking at the facts as they existed respecting defendant's road at the time the track in question was removed, it must be seen and held that Tomah was then the true and only southern terminus of the road.  And if so, then the removal of the road from Tomah was an unlawful act, for which the franchises of the company are liable to forfeiture under the general statute (R. S., ch. 160, sec. 4; Tay. Stats., 1808, § 8), as well as under ch. 31, Laws of 1873.  The real effect of the latter statute was, conditionally to relieve the company from the forfeiture already incurred.  Sec. 5 of the charter, and sec. 23, ch. 119, Laws of 1872, by authorizing certain changes in the line of road to be made in certain specified ways, impliedly prohibited every

other change; and this was equivalent to an express prohibition. And it is confidently submitted that neither at the common law nor under the statutes can a corporation of this kind, in whose favor the power of eminent domain has been exercised, *abandon* any considerable portion of its road, or of its franchise, without working a forfeiture of its corporate rights, at the election of the state, or of the sovereign legislative power that created it.

*Vilas & Bryant*, for respondent, argued substantially as follows:

A. As to the right of the state to maintain this action under sec. 4, ch. 160, R. S.

I. The legislation of the state, prior to 1873, in terms authorized the acts complained of. 1. The charter never fixed Tomah as a terminus, or even as a station, on this railway. It provided that the road should be located " from such point as the directors shall determine in the town of Tomah in the county of Monroe, *or* on the track of the Milwaukee & La Crosse Railroad, *or* of any other railroad running out of Tomah." And after the location was actually made in the *town* of Tomah, no positive provision of the charter required that location to be perpetually maintained. If any provision lay in the law for continuing the line of the road as originally located, or for not proceeding beyond that place as a terminus, it was of a negative kind, resulting from exhaustion of chartered rights by a single location of the track, and the want of a grant of power to proceed further south than that town, or the track of the Milwaukee & La Crosse Railroad. But sec. 5 of the original charter provides that " said company shall have power to connect its railroad with any other railroad in this state, and to operate the same in connection with such other railroad." This is not a grant of power to connect with such roads merely as should be reached or crossed by this in its original course, because that case is fully provided for earlier in the same section, and the scope of the words quoted is manifestly designed

to be much greater. "To connect its railroad with *any* other railroad *in this state*," necessarily implies the construction of a track over the country lying between its road and such other, no matter what the distance, provided only it be within this state. Any limitation upon this construction would be an arbitrary restraint imposed upon words which are so plain as not to admit of interpretation, and would as well exclude power to connect with a road one mile distant as with one fifty miles distant. *Belleville R. R. Co. v. Gregory*, 15 Ill., 20; *Newhall v. R. R. Co.*, 14 id., 273. 2. To " make assurance doubly sure," however, the company obtained the act of 1870 (ch. 516, P. & L.), which in terms authorized it " to extend the line of said road to the south line of this state." Accordingly, in September, 1871, as the answer shows, the board of directors, with the express authorization of the stockholders, adopted a resolution for the purpose of making such extension of the road to the south border of the state, and instructed the president of the company to cause an immediate survey and location to be made of the line south from Tomah, and to proceed immediately to construct the road as far as Elroy, where it might connect with the Chicago & Northwestern road then building; and a line was actually surveyed and located from Tomah to Elroy, upon the only feasible route, via Camp Douglas, a point on the M. & St. P. Railway, and the road was actually constructed from Camp Douglas to Elroy, in the expectation of using the track of the M. & St. P. Railway from Tomah to Camp Douglas until a track could be constructed by defendant between those points the following year. Thus, by the law of the state, and the action of the company under it, Tomah, never possessing any positive right of its own, lost all title to be designated or regarded as a *terminus* of defendant's railway; Elroy becoming the southern terminus, and Tomah an intermediate station. 3. The company now met an obstacle to the fulfillment of its plan in the refusal of the M. & St. P. Company to permit the use of its track from

Tomah to Camp Douglas; and the directors, looking to the convenience of the stockholders and the interests of the general public, shortened and perfected this part of its route by reconstructing the road in a direct line from Warren's Mills to Camp Douglas. Did the law authorize this change? (1) The charter empowered the company "to survey, locate, construct, *complete*, alter, *change the location of, reconstruct*, maintain and operate a railroad" from any point, to be determined by the directors, in the town of Tomah, *or* on the track of any railroad running out of that town. Camp Douglas was a point on the line of a road running out of Tomah. So, also, by the change defendant connected its road with the Wisconsin Valley road running out of Tomah. Thus, two points were reached, either of which might have been originally selected by the directors under the charter. The language above quoted plainly indicates that the company, after having once *constructed* and *completed* its road, might change its location and *reconstruct* it. *How much* of the road, as once constructed and completed, could thus be relocated and reconstructed? In other words, what limits were intended to be placed upon the power so clearly granted? Obviously, *the original limits* mentioned in the charter, for the construction of the road. It was granted the directors once to review their own action, and to exercise again the discretion originally extended to them respecting the line of the road. *Boston & Prov. R. R. Co. v. Midland R. R. Co.*, 1 Gray, 340. We say *once*, because the grant of power to change and reconstruct seems to be exhausted by a single use, upon the same principle as a power to first construct is so exhausted. The company, then, had power to take up the track it had once laid, to abandon the first location, *provided* that it reconstructed its road in such a manner as to make it accomplish the ends pointed out by its act of incorporation. (2) The acts complained of have sufficient warrant in the general railroad law, ch. 119, Laws of 1872. By sec. 55 of that act, every existing railroad company was subjected to its provisions, and invested with all

the powers and privileges conferred by it. By sec. 23, a general power is granted to directors of any railroad company, to " at any time alter or change the route, or any part of the route, of their road, *or any part of their road as constructed*, if it shall appear to them that the line can be improved thereby," subject to certain limitations, none of which are applicable here. To escape the effect of this provision as a perfect warrant for the action of the company here complained of, it is claimed that the act of 1859, so far as it relates to termini, is still in force. But, (a.) sec. 23 of the act of 1871, is manifestly a *revision of the entire subject matter* of the act of 1859, and therefore repeals that act wholly, although it be not wholly inconsistent with it. *Lewis v. Stout*, 22 Wis., 234, 236. The rule is specially applicable here, because it is manifest from the statute, and otherwise known as a fact, that this act of 1872 was adopted, after much consideration, as a general railroad law, for the purpose of compiling into one act all previous provisions, and thoroughly revising the entire subject of the incorporation and the corporate franchises and powers of railroad companies; and during the same session similar acts were passed relating to other corporations, upon the spur of the recently adopted constitutional amendment against special legislation. See also *Burlander v. M. & St. P. R'y Co.*, 26 Wis., 76. (b.) The act of 1859 is clearly repugnant to that of 1872. It is claimed that there may remain of it a provision against changing termini. But that act established no substantive rule against changing termini; the words " termini " and " stations " being introduced in an exception to an exception — a limitation to a proviso ingrafted on the substantive enactment. The act, as a whole, is swept away. It is manifest that under the act of 1872, stations may be abandoned when cities, towns and counties may; any part of the track may be taken up. Does *one* word of the act stand — a word not used to express a rule established, but only an exception to that rule? It is argued that under the act of 1872, standing alone, a road constructed

The Attorney General vs. The West Wisconsin Railway Company.

from Milwaukee to Madison might be changed to one between Racine and Portage City ; and this is claimed to be an absurd consequence. It is not legally absurd, but directly within the spirit of the law ; although it may be answered better that such a proceeding would be more than a change. A company formed under that law may at any time surrender its corporate franchises. So any body of men may at any time form a company under that law and build a railroad. Having been a company engaged in operating a road between two given points, the same men may lawfully surrender that franchise, and become a company operating a railroad between to other points, and may employ their iron and cars upon the new route. Such a general opening up of the railroad business to any that will engage in it, precisely as manufacturing is opened, constitutes the leading feature of the law. The power to change part of a road, constructed, is a less power, to some extent contained in the other, within the whole spirit of the law, and only limited by obligations to municipal corporations which have acquired vested rights by giving corporate aid. (c.) Whether the act of 1859 be absolutely repealed or not, both the charter of the company (acts of 1863 and 1870) and the act of 1872 authorized it to do the act complained of. (d.) We have already shown that before the change of location Tomah had ceased to be the terminus of defendant's road ; and the provision of the act of 1859 relating to termini, if still in force, had no application to the case.

II. It was competent for the legislature of this state to grant to the company the power which it has exercised. The language of the acts of congress of 1856 and 1864, as to the purpose to which the lands granted thereby should be applied, was manifestly intended merely to secure their application to the construction of a railroad ; and it was provided that, unless that purpose should be realized, the United States might refuse patents, declare a forfeiture, and recall the grant. If that purpose was fulfilled, the title was to be passed to the railroad

company. When so vested, it vested freed from this condition, *because the condition must have been fulfilled.* The United States imposed no condition with respect to the future maintenance of the track in any particular place; and it may be doubtful whether the sovereign control of the state over its own corporate creature could have been so limited. The objection now taken to the power of the state legislature, if maintainable to the extent claimed, would also prevent the legislature from repealing the charter of the company. It must also prevent the destruction of the company, and of its railroad, by the prosecution of this suit. For the lands granted, many, perhaps all, of which have been sold to individuals, cannot be recalled, nor .can the property in the land, iron and cars, be taken from the stockholders; and therefore a judgment of ouster must destroy the road. Conceding, however, for the argument's sake, that the route fixed by congress must be maintained, this is to be taken reasonably. Taking the two acts of 1856 and 1864 together, it is manifest that the route designated by congress was from Madison *via* Portage City to Lake St. Croix. The change now made is no diversion from the general route. It falls within that class of changes which, upon all the authorities, a corporation may make, in furtherance of, not departure from, the original general plan, without releasing a stock subscription or other contract based upon an anticipation of benefits to be derived from a certain route. 1 Redf. on R. W., 211, sec. 8; *Kenosha etc. R. R. Co. v. Marsh,* 17 Wis., 13. Before an act of the legislature can be declared unconstitutional, some provision of the constitution must be plainly violated. With at least equal reason it may be insisted that before an act of the legislature *in regulation of the franchises of its corporate creatures* shall be held invalid, the repugnant provision of an act of congress, claimed to have that effect, must be very clear.

B. As to the right of action under ch. 31 of 1873, counsel argued, *inter alia,* that if the previous conduct of the defendant in abandoning its old track from Warren's Mills to Tomah

was lawful, the right of way acquired by the company over lands between those points had been surrendered, and the lands relieved from the servitude, and the track could not be again laid on that route without a new exercise of the right of eminent domain.  The question presented by the act of 1873, stated most favorably for the plaintiff, is, whether the legislature can require a railway company, having a line of road already built under a charter granted by the state, to construct, maintain and operate another and entirely independent road within a limited time; to declare that a failure to do so shall work judicial forfeiture of its charter; and to require the court to pronounce that judgment.  The law is clearly an outrage upon every line of the constitution designed to protect the vested rights of property, to support contract obligations, to prevent retrospective condemnation of lawful acts, and to confine within appropriate bounds the legislative power. But it is claimed to be an exercise of the reserved right to " alter or repeal " acts of incorporation.  The existence of this suit demonstrates that the power to *repeal* was not exercised. The act does not profess to repeal, and does not repeal, anything, either absolutely or conditionally.  Is it an exercise of the power to *alter?*  1. The history of the act, its language and all the circumstances out of which it grew, show that it was passed because it was supposed to be the preservation, not the alteration, of the chartered route.  It was a legislative decree of specific performance to enforce a legal duty of restoring an alteration.  It has been shown that all this was erroneous — that in fact the new line was a lawful and authorized one.  The theory of the act is thus destroyed.  To endeavor to sustain it as an amendment and an alteration, is to overturn the idea of the legislature; to attribute to their act a character which they did not give it, and to seek to support it upon a power which they never designed to exercise.  2. The power to alter differs from that to repeal in that it is limited within some bounds.  Just what these are may be very difficult to

determine in many cases. But "when it comes to the question of embarking in a new enterprise, the legislature cannot impose this as a duty on any corporation." PAINE, J., in *Kenosha etc. R. R. Co. v. Marsh*, 17 Wis., 13; a case which is approved as expressing the true limit of the power, in *Attorney Gen'l v. Railroad Companies*, 35 Wis., 425. In this case the old road, i. e., the one lawfully existing when the act of 1873 was passed, is not to be changed, but is to remain and be operated. The one required to be newly constructed from Warren's Mills to Tomah is to be *in addition* to the other. The question which Judge PAINE was considering was that of the legislative power to *substitute* a new enterprise for that first chartered. If the legislature has not this power, still less can it compel a railroad company to build an additional railway after it has once constructed one as chartered, and prescribe judicial *forfeiture* as a penalty for the *offense* of neglect. This is not to "alter." 3. Again, both the power to repeal and the power to alter relate to the franchises and *privileges* which the state grants to the corporation. They may be taken away altogether. But to charge it upon a company to build a road additional to that which it has lawfully constructed, is not to alter the franchises and privileges which it already enjoys. To impose new franchises and compel new expenditures as a condition of not forfeiting existing rights, is unauthorized. *Miller v. The State*, 15 Wall., 478.

RYAN, C. J. I. It was understood on the argument of the demurrer, that, prior to 1863, the La Crosse & Milwaukee Railroad Company had located and built, as part of the land-grant road under ch. 122, Laws of 1856, the road from Portage City to Tomah, and had located the line of the land-grant road northward from Tomah to Lake St. Croix, but had failed to build any part of the land-grant road beyond Tomah; and had built its road westward from Tomah to La Crosse, outside of the land-grant route and wholly distinct from it.

Thereupon the legislature, by ch. 243. of 1863, repealed so much of the franchise and grant to the La Crosse & Milwaukee Company as was applicable to the road from Tomah to Lake St. Croix, and incorporated the defendant by the name, afterwards changed, of the Tomah & Lake St. Croix Railroad Company; endowing it, for the purpose of aiding it in the construction of the road which it was thereby authorized to construct, with so much of the land grant as was applicable to the road from Tomah to Lake St. Croix, resumed from the La Crosse & Milwaukee Company.

It is very manifest from the general scope and tenor of the charter, that it was the purpose of the legislature to substitute, as its agent or trustee under the grant from congress, *pro tanto*, a new company, for the insolvent and almost extinct La Crosse & Milwaukee Company, so as to secure so much of the land-grant road as the charter covers, which the latter company had virtually abandoned: that is, the road from Tomah to Lake St. Croix; placing the new company, *quoad hoc*, in the very position abandoned by the old. The road which the defendant was authorized by sec. 5 to locate, construct and operate, is afterwards some three. times designated in sec. 14 as a road from Tomah to St. Croix; corresponding exactly with the franchise of the La Crosse & Milwaukee Company repealed in sec. 18, with the grant resumed from that company and conferred on the defendant, and with the terminal designations in the name of the defendant.

In sec. 5, however, the express authority to the defendant is to locate, construct and operate a road from such point as the directors should determine in the town of Tomah, *or* on the track of the La Crosse & Milwaukee Railroad, or of any other railroad running out of Tomah, by way of Black River Falls, to such point on Lake St. Croix between townships 25 and 31, as the directors should determine.

Laying out of view the contingency of other railroads running out of Tomah, if this choice of the southern terminus is

to be taken literally, uncontrolled by other parts and the general tenor of the charter, the directors might have located it at Milwaukee, or at La Crosse, or at any intermediate point of the La Crosse & Milwaukee Railroad. This is so palpably and strangely inconsistent with the whole scope and tenor of the charter, and with its language elsewhere, that it is difficult to accept it as the intention of the legislature. It is plain throughout the statute that the legislature intended the southern terminus to be within the town of Tomah. And a choice of it outside of the town, might have been so made as to baffle the whole policy of the statute. Indeed there is a positive contradiction between sec. 5 and sec. 14; and one or the other must give way. But while it is so difficult to comprehend why an election of terminus should be given outside of Tomah, it is very easy to understand why the legislature should require the southern terminus within the town to be connected there with another railroad, so as to make a connected line to other points. This suggested to us that the entire difficulty would disappear by reading *and* for *or*. It struck us so forcibly that this must be the true reading that we referred to the enrolled act; but there we found the same word as in the printed volume.

In such a case, in a private document, there would be no difficulty in construing *or* in the sense of *and*. In deeds, agreements, wills and other private papers, the word *or*, said to be one of the most equivocal in the language, should be construed in a copulative and not in a disjunctive sense, when necessary to the spirit and intent of the document. In such papers, *and* and *or* are readily convertible words according to the sense required by the context; and ever since what is called the leading case of *Fairfield v. Morgan*, the rule has been familiar to the profession. See *Mallory's Case*, 5 Coke, 111 b.; *Denn v. Kemeys*, 9 East, 366; *Right v. Day*, 16 Id., 67; *Fairfield v. Morgan*, 5 Bos. & Pul., 38; *Jackson v. Topping*, 1 Wend., 388; *Hunt v. Hunt*, 11 Met., 88; *Englefried v. Woelpart*, 1 Yeates, 41; *Griffith v. Woodward*, id., 316.

The Attorney General vs. The West Wisconsin Railway Company.

It is not very apparent why the same rule should not be equally applied to statutes, yet it does not appear to have been often done; and Mr. Dwarris seems to question whether it should be done except to support a settled construction. Dwarris, 772. But he seems to have overlooked *Hall v. Philips*, 1 Ventris, 62, in which *or*, in a penal statute, was held to mean *and*. In *White v. Commonwealth*, 1 S. & R., 139, the court held *or* to be copulative not disjunctive, and equivalent to *that is to say*.*

And, seeing no other way to reconcile the apparent inconsistencies of the defendant's charter, and seeing this way of putting all its provisions in perfect accord with each other and with the evident design of the legislature, we feel warranted by authority in holding *or* in the phrase in question in sec. 5 to be equivalent to *and;* so that it shall read —" in the town of Tomah and on the track of the La Crosse & Milwaukee Railroad or of any other railroad running out of Tomah :" corresponding with the description of the road in sec. 14.

Any doubt which there might be about this construction, is cured by ch. 232 of 1865, making a further grant of lands conferred by congress on the state, for the purpose of aiding the construction of a road from the town of Tomah to the St. Croix river or lake, and confirming the original grant to the defendant to aid in building *the said railroad*. This seems to have been a timely legislative construction of the charter; an amendment of the description in sec. 5, if such amendment were necessary.

We hold therefore that the choice of the southern terminus of the road was limited to a point on the La Crosse & Milwaukee Railroad or other road running out of Tomah, within the town of Tomah.

---

* See *Winterfield v. Stauss*, 24 Wis., 394, and *O'Connell v. Gillespie*, 17 Ind., 459, there cited, which were overlooked when this opinion was written. See also *Farrell v. Lamar*, 1 Wis., 8.

And, accordingly, the directors located the terminus on the line of the La Crosse & Milwaukee Railroad, adjoining the village of Tomah, in the town of Tomah. When this was done does not very plainly appear in the pleadings: presumptively in 1866, subject to the act of 1865. This was certainly a valid location, according to any construction of the charter; and the point so selected and determined became and remained the fixed terminal point of the road, as much as if it had been specifically so designated in the charter. It seems to us very certain that the designation then of Camp Douglas, in another town and another county, as the southern terminus of the road, would have been unwarranted by the charter and invalid.

We say that the point selected became and remained the fixed terminal point, because the charter, giving express power to change the location of the route of the road, withholds power to change the termini, once determined. The power to locate the termini, once exercised, was at an end. And all the power of the charter' to change the route of the road, is expressly to change the route between the termini. All the franchises of the charter are dependent on the franchise to locate, construct and operate the road between the termini. The legislature gave to the defendant continuing power of change between the termini; but none over the termini, once fixed. There are, as is argued, very ample words in the section going to the power to change, but the whole power goes to the route between the ends, and not at all to the ends themselves. This is too plain for argument. The mere reading of the section is conclusive.

It appears that the defendant constructed the road from this southern terminus northward by way of Warren's Mills and Black River Falls to St. Croix, and filed the necessary plat of the road to entitle it to the land grant, and did entitle itself to the land grant northward from the southern terminus, and did receive it from the state for every twenty miles of road built,

including the road from the terminal point in Tomah to Warren's Mills, a distance of about ten miles.

By ch. 516 of 1870, the defendant received authority to extend the line of its road to the south line of the state.

The defendant pleads that, under this authority, it caused several lines for the extension of its road south to be surveyed from the terminus in Tomah to Elroy in this state, the actual northerly terminus of the road of another company leading from Chicago, and that a practicable route could not be found direct from Tomah to Elroy ; and that the only practicable route between those points was found to be along the line of the La Crosse & Milwaukee road, some twelve or thirteen miles, to Camp Douglas, and thence southerly to Elroy,— a route alleged and appearing on the map annexed to the pleading to be an indirect and inconvenient one ; that it finally passed a resolution locating the southerly extension of its road on that line ; and that thereupon it built the road from Camp Douglas to Elroy, intending to make a temporary running arrangement over the La Crosse & Milwaukee road from Tomah to Camp Douglas, and ultimately to build its own road between those points ; that the contemplated arrangement with the La Crosse & Milwaukee road failed ; that thereupon the defendant altered and straightened its line of road, so as to run direct from Warren's Mills to Camp Douglas, which was accordingly done by the construction of a new road on the new route, making a direct route from Warren's Mills to Elroy, excluding Tomah, which is alleged to be, as it appears on the map, a shorter and better route ; and that thereupon it discontinued the road from Warren's Mills to Tomah, and moved the rails and ties from it.

These transactions are verified by oath, and their *bona fides* is admitted by the demurrer; or it might have been difficult to understand that, failing a practicable route direct from Tomah to Elroy, there ever was a serious purpose of extending the

defendant's road from Tomah *via* Camp Douglas to Elroy. It is worthy of notice that it is not pleaded that there was any attempt or failure to find a practicable route from Tomah to the south line of the state, but to Elroy only, as if the defendant had substituted Elroy for the south line of the state as the southerly end of the extension. All this was probably good railroad policy, if such policy were independent of franchise; but it was not compliance by the defendant with the law of its creation.

Taking the facts just as they are pleaded by the defendant, we cannot hold them to be within the authority to extend the line of the defendant's road to the south line of the state. The power which the defendant took was, not to build a new road from any point on its old road, to the south line of the state, but to extend its old line of road there, that is, to extend the whole road. And the line of road which the defendant was authorized to extend is expressed in all the statutes relating to it to be the road from Tomah to St. Croix. And the terminal point in Tomah being once fixed, the authority to extend was to extend from that very point; for extension must begin at the end of the thing extended, so that the line extended and its extension shall form a continuous line. The authority to extend was as well limited to the point in Tomah, as if it had been so nominated in the statute authorizing the extension. It is so expressed in the word extend. And it is difficult to understand how this road was extended by a process which did not add a rail to it, but made its extension impossible until it should be itself restored, by obliterating the end of the road to be extended.

It is not pretended that the road from Warren's Mills to Camp Douglas was an extension. That road is claimed to be a change of route, after extension. And surely the road from Camp Douglas to Elroy was not an extension of a road which it did not reach by some twelve or thirteen miles. Assuming, as we are bound on the demurrer to assume, that it was built

to form part of the proposed extension, it could become a part of it only upon the extension of the road from Tomah to it. Hiatus annihilates the essential condition of extension. In such a case, lines not connecting may be intended to be connected, and thereupon will form one continuous line, the new being an extension of the old; but until then they are separate and distinct lines, not parts of one line. And the legislature did not intend a theoretical or intentional extension, but an actual and practicable extension, over which trains could pass continuously, without encountering a gap of several miles furnished only with an intentional track.

We lay out of view the arrangement to run over the La Crosse & Milwaukee road, which rather appears to us to be equivocally pleaded: because it is difficult to see how such an arrangement would have been a compliance with the authority, and because it was never consummated, but rested altogether in proposition. Indeed it seems to be pleaded only by way of apology for what was done.

Nothing appears to have been done looking towards the construction of the road from Tomah to Camp Douglas, except the naked resolution of the directors to make it the line of extension. And this is set up as an execution of the power to extend. And it is claimed that, the road being thus extended, Tomah ceased to be a fixed terminal point, Elroy taking its place for the time as the terminus of a road with which it was not connected; and that the extension of the road from Warren's Mills by Camp Douglas to Elroy was a legitimate exercise of the power to change the location of the road under sec. 5 of the charter, and under sec. 23 of the general railroad act of 1872.

We have indicated the fallacy of the position that a mere resolution to extend the road operated to extend it. What the legislature authorized was an extension by a road, not by a resolution. The resolution looked towards extension, but did not extend. It was the line of actual road that was to be extend-

ed, and the extension could be only by actual road. The legislature looked to a highway for the carriage of passengers and goods, not to the resolution of a board or the plat of an engineer: to a fact, and not to a theory: to a thing, and not to an intention. Extension of anything must be of the quality of the thing extended. A resolution may extend a resolution: a line on paper may be extended by a line on paper: but a railroad can be extended only by a railroad. The extension of a railroad by a declaration of intention seems to partake of the quality of Mr. Harold Skimpole's philosophy of payment. A resolution to extend a road extends it, just so much as a resolution to fence a road fences it. And the resolution rested wholly within the power of the directors, to alter or rescind, as virtually happened with this resolution, obliterating the extended railroad with the motion of a pen. Where one power is made dependent on the execution of another, the former cannot be put in motion by a resolution to execute the latter. Promise cannot take the place of performance. If there were power granted to the defendant to alter the road away from Tomah, after the extension, the extension must precede the alteration. Tomah certainly remained the actual terminus of the road, when the alleged alteration was made. And it was a change of terminus, not of route.

Were this otherwise—had the road been legally extended,—we cannot say that the power to change the route of the road away from Tomah would have followed. The principal road, the road extended, would still be the road from Tomah to St. Croix: the extension going from Tomah. The franchise would still be to build and operate an extension from Tomah. The extension would still be dependent on the road extended: an accessory to its principal. If the statute authorizing the extension should be repealed, where would the franchise of the defendant under the original charter end, as applicable to the actual road as it is to day? We are inclined to think at Warren's Mills, because the extension really proceeds from there.

And there is no doubt that, in that case, the defendant would have, as it now has, a franchise to restore and operate its road from Warren's Mills to Tomah. We see nowhere indication of legislative intention to authorize the defendant to abandon the terminus of the road once fixed under its authority.

So far as the charter of the defendant is concerned, we have already shown that the power to alter the road is limited to alteration between the termini. The general railroad act of 1872, as amended, confers on the defendant, in addition to the powers of its charter, the powers contained in that act itself. That requires parties seeking incorporation under it, to execute articles of association stating, amongst other things, the places from and to which their road runs or is intended to run, the length of the road, and the counties through which it is made or intended to be made, but no particular or other statement of its route. These articles are the basis of incorporation, to be filed in the secretary of state's office. Upon these articles is issued the state patent of incorporation to construct, maintain and operate the road from one terminal point to the other, without stating the counties through which it is to run. And the corporation takes a franchise for a road between the terminal points specified, and for no other road. In the body of the act power is given to the corporation to change the route or any part of the route of their road or any part of their road ; filing in the office of the clerk of the circuit court of the proper county a certificate of the change.

Here also we take the power to change the route of the road to be a power to change it between the terminal points specified in the patent, " their road ;" and not to change the termini themselves. The jurisdiction of the state officers to issue the patent rests on the articles of association ; and both the articles and the patent are limited by the terminal points stated. Neither are to give the route in detail, which is not jurisdictional ; and therefore power is given to change the route for convenience of the road between the terminal points. And

when such change is made, the certificate of it, going to local arrangement and not to the fundamental franchise, is filed in a local office and not in the secretary's office. It is even matter of doubt whether the change of route authorized can involve a change of the counties specified in the articles.

This view seems to us to be necessarily implied in the word *route*, which, as the dictionaries tell us, implies passage to and from. The word is a French one, and we find it defined in Fleming & Tibbins' standard French dictionary, as "a way used for going from one place to another." And, corresponding with its defined meaning, its common acceptation excludes terminal points, and makes it dependent on them.

We feel quite satisfied that the legislature, in giving liberal power to change the route for convenience, intended to give no power to change the places between which the road is to run, and so to leave railroad corporations free, by a little management, to change specific charters into roving commissions throughout the state. The legislation of the state is liberal enough of franchise to these corporations, in all conscience, to leave them without excuse for licentious construction of their charters.

Were the position of the defendant well founded, we can see no reason why, in this case, the defendant might not have changed the whole road, abandoning it from its terminus on Lake St. Croix, and selecting at will any route to the south line of the state; wholly disregarding the legislative policy in its creation, and overlooking that the operation of the road chartered was a public trust committed to it and accepted with its charter. This follows logically from the position taken, and involves the absurdity that authority to extend a road operates as authority to abandon and remove the road to be extended, and to build a road different in all respects except one terminal point, to be in turn abandoned and deserted in a future reformation of the route of the new road, making railroads, as suggested by the defendant's counsel, chartered vagrants.

It will be noticed that we have not rested our conclusions on any of the provisions of ch. 58 of 1859; and that the question of the repeal of that statute by ch. 119 of 1872 is not involved or considered in this case.

Neither have we taken any aid from the view that the defendant's road is a land-grant road, for the construction of which the state has paid a consideration. It is said that, the road being built, the contract is executed. If this implies that, having obtained the grant, the defendant is at liberty to discontinue the road, we cannot assent to it. The charter, being in perpetuity, and being a contract upon consideration proceeding from the state to the corporation, appears to us to be binding in perpetuity, unless and until sooner determined by law. And, until determined, or until it be so changed by the law governing it, we do not perceive how the defendant can evade the duty of maintaining and operating the road, without breach of contract. It would be a strange disposition of the bounty of the United States and of the state, for the endowed company to build twenty miles of road and receive corresponding twenty miles of grant; take up the twenty miles of road built, build other twenty miles of road and receive other twenty miles of grant; take that up in turn, and so on to the end; absorbing the whole grant and leaving no vestige of road in the route of the grant. This the defendant can do, if it can without legislative authority take up one mile of the land grant road built. The acceptance of the franchise, in any case, involves a public trust; in this case it involves a public trust upon valuable consideration in addition to the consideration of the franchise. We apprehend that the bare statement of the scope of the proposition is sufficient to show it as deficient in morality as in logic.

We have dwelt upon this subject at, perhaps, undue length, not because there appeared to us to be any difficulty involved, but in deference to the length and earnestness and ability with which the opposite positions were pressed upon us.

These views compel us to hold, that the defendant, in discontinuing and taking up its road from Tomah to Warren's Mills, violated the provisions of its charter and its duty to the state under its charter.

And it follows, that the road which the defendant is required by ch. 31 of 1873 to relay and equip, is part of its chartered road, which it had built and was bound to maintain, and not a new road coming within the principle stated in *Kenosha etc. R. R. Co. v. Marsh,* 17 Wis., 13, and at the present term in *Attorney General v. Railroad Companies,* 35 id., 425.

II. On principle and authority there seems to be little room for doubt, or even for discussion, that this case comes within the first and second subdivisions of sec. 4, ch. 160, R. S., and that the act of the defendant, in discontinuing and taking up its road, as set up in the information, constitutes an offense against the provisions of its charter and a violation of public law, working forfeiture.

The case of the Albany & Vermont Railroad is, in many respects, very similar to this. There the company was incorporated for a road from Albany to Eagle Bridge, which was built the whole distance, and then discontinued and dismantled for some twenty-one miles from Waterford Junction to Eagle Bridge ; the rest of the road being operated with other roads. There, as here, it was claimed, that this was done under resolution of the directors as an exercise of the corporate right to change the route of the road.

In that case the New York courts discuss the distinction between the original obligation to build the road, and the right to discontinue part of it, when built. But the right to abandon and take up part of the road is denied, and the duty to maintain the whole road, when once completed, is asserted, in all the reports of the case. The discussion is interesting, but we have space for only a single extract. The court of appeals say :

" The defendant has abandoned all its road east of Water-

ford Junction, whilst it is continuing the operation of that part between Albany and Waterford, in connection with the Rensselaer & Saratoga Railroad. It is exercising its corporate rights and privileges and the franchise granted by the state to maintain and operate a railroad between Albany and Eagle Bridge, in the operation of one between Albany and Waterford Junction, without any assent by the legislature to the abandonment of any part of its road, or any legislative modification of. the franchise granted to it. This cannot be legally done. It is the exercise of a franchise or privilege not conferred on the defendant by law." *People v. Albany & V. R. R. Co.*, 19 How. Pr., 523; 37 Barb., 216; 24 N. Y., 261.

The general principle is very ably and elaborately discussed in *People v. Kingston & M. T. R. Co.*, and *People v. Bristol & R. T. R. Co.*, 23 Wend., 193, 222.

The English King's Bench, holding the same view, issued a *mandamus* for the restoration of part of a road dismantled by the corporation. *Rex v. Severn & W. R. R. Co.*, 2 Barn. & Ald., 646.

These authorities, in which we entirely concur, seem to us to govern this case.

Some of the provisions of ch. 31, Laws of 1873, well discussed at the bar, raise important and interesting questions which we have not noticed, because, as has been seen, we hold that this proceeding can be maintained without aid from that act.

We have arrived at this view with somewhat of reluctance, because, as the facts are pleaded in the defendant's answer, which we must assume to be correct on the demurrer, the defendant's road appears to have been improved, without special injury to any locality. But, conceding that, it appears to us to have been a grievous error of the defendant to attempt to evade its charter and take the law into its own hands. With its views of its interest, it should have appealed to the legislature for authority to do what it has done without authority.

State e֊ rel. McDill vs. The State Canvassers and the Secretary of State.

And we have the less reason to regret any apparent hardship in this decision, because the distinguished gentleman who argued the demurrer for the state, declared the purpose of the state to be the restoration of the discontinued road, and not the forfeiture of the charter, unless in case of obstinate resistance by the defendant.

*By the Court.* — Let an order be entered sustaining the demurrer to the defendant's answer, with leave to the defendant to answer over to the information by the first day of the next term.

