## FARMERS' LOAN & TRUST CO. *v.* GREEN BAY & MINNESOTA R. CO.

*(Circuit Court, E. D. Wisconsin.* January, 1881.)

**1. RAILROAD—MORTGAGE FORECLOSURE—PETITION FOR BILL OF REVIEW.**

A trustee filed a bill to foreclose two railroad mortgages, January 23, 1878, and obtained a decree of foreclosure April 3, 1879. *Held*, upon petition of a second-mortgage bondholder for a bill of review, filed January 10, 1881, within a few days before the sale under the decree of foreclosure was advertised to take place:

(1) That an adjudication in such decree that part of the second-mortgage bonds were issued in exchange for interest coupons due upon the first-mortgage bonds, and were, with interest thereon, "a lien under the said first mortgage, and constituted a part of the debt secured thereby," did not entitle such second-mortgage bonds to a preference over the first-mortgage bonds.

(2) That, therefore, where the decree had provided that the greater part of the purchase money, upon the sale of the railroad, might be paid in cash, or first-mortgage bonds, or such second-mortgage bonds as had been therein adjudicated to be secured by said first mortgage, at such percentage as the court should authorize at the confirmation of the sale, it was not necessary that such decree should further provide for a cash payment at the time of the sale sufficient in amount to liquidate in full such second-mortgage bonds as were secured by said first mortgage.

(3) That a course of procedure prescribed by the mortgages, to be pursued in case of a sale by the trustee without foreclosure, was not binding upon the court in proceedings to foreclose such mortgages.

(4) That, therefore, upon a foreclosure sale, the court was not bound to adopt the provisions of the mortgages, as to the application of the bonds upon the bid of a purchaser, or as to the proportion in which such bonds should be so received, or as to the manner in which their value should be ascertained.

(5) That where the decree authorized the mortgage bonds to be applied on the purchase of the railroad upon the foreclosure sale, it was not essential that such decree should determine the percentage value of such bonds before the sale actually took place.

(6) That, therefore, a provision in such decree that the purchaser, after the payment of a certain specified amount in cash, could pay the balance of his bid in outstanding bonds and coupons, secured by the first mortgage, "at such percentage of the face value thereof as this court shall, at the approval of said sale, authorize and direct," was not erroneous, and was similar to that inserted in all railroad mortgage foreclosure sales entered in the (seventh) circuit.

(7) That the court could require, upon the subsequent presentation of intervening claims, as a condition precedent to the confirmation of the sale, that the purchaser should make a larger cash payment to meet all exigencies than that fixed by the terms of the decree.

(8) That a question as to an adverse title to a part of the mortgaged premises, pending between the receiver of the railroad and a third party, did not seem to be one that could be litigated in a suit to foreclose the mortgage.

(9) That the denial of the railroad's title would divest the petitioner of all right to object to the decree and foreclosure proceedings, upon the ground that such third party was not made a defendant to the foreclosure suit.

(10) That where, upon default, a majority of the bondholders had requested the trustee to institute foreclosure proceedings, the mere fact that certain bondholders, including the president of the railroad, retained counsel for the company for the purpose of procuring service of process of subpœna in a genuine action to foreclose these valid mortgages, given to secure a just debt, did not constitute a fraud upon the petitioner, although she had no knowledge at the time of such action by said bondholders.

(11) That an agreement entered into between the bondholders for the proposed reorganization of the road could only be considered, under the petition, to the extent that the particular interests of the petitioner might be involved; and that under this restriction no such grounds of objection to the agreement were presented, or such probable injury to the petitioner shown, as made the petition sustainable.

(12) That it was a serious question whether the petitioner had not been guilty of laches in presenting such petition nearly two years after the decree had been filed, and within a few days before the sale was advertised to take place, without any averments in the petition that would seem to sufficiently excuse the delay.

(13) That the petition did not allege that the petitioner had any interest in the second-mortgage bonds secured by the first mortgage, or that the mortgaged property was of sufficient value to pay more than the first-mortgage bonds, or contain any allegation whatever as to the value of the mortgaged property, and that therefore it was not certain that the petitioner, as the holder of the bonds described in her petition, had any real interest in the subject-matter of the controversy.—[ED.

In Equity.

*Finches, Lynde & Miller*, for petitioner.

*E. C. & W. C. Larned*, contra.

DYER, D. J.   On the twenty-third day of January, 1878, the complainant in the above-entitled cause, as trustee for bondholders, filed a bill in this court to foreclose two mortgages on the railroad and property of the defendant company,

given to secure the payment of certain issues of bonds, amounting in the aggregate to $5,300,000. On the third day of April, 1879, a decree of foreclosure and sale of the mortgaged property was entered. On the tenth day of January, 1881, and but a few days before the sale under the decree of foreclosure was advertised to take place, Mary M. Kelly, a holder of bonds secured by one of the mortgages, filed a petition in said cause praying leave to file a bill of review for certain alleged errors and irregularities in the foreclosure proceedings; and the question has been raised by demurrer to the petition, and argued and submitted, whether or not leave to file such a bill should be granted. The determination of petitioner's right to file a bill of review involves, therefore, a consideration of the contents of the petition in connection with such parts of the record in the foreclosure case as are brought into controversy by the allegations of the petition.

As appears by the foreclosure decree, the original issue of bonds secured by the first mortgage was $3,200,000, and the issue of bonds secured by the second mortgage was $2,100,-000.

The petitioner alleges herself to be the holder of second mortgage bonds amounting to $14,320, besides interest. The decree adjudges that "of the said second mortgage bonds the sum of $850,260 was issued in exchange for interest coupons, due upon said first mortgage bonds, and is, with the interest due thereon, a lien under the said first mortgage, and constitutes a part of the debt secured thereby;" and by the decree it is further adjudged and decreed "that the entire amount of bonds secured by the said first mortgage is the sum of $4,050,260, being the amount of first mortgage bonds of $3,200,000,  *  *  *  and the said amount of $850,260 of second mortgage bonds issued as security for interest due on said first mortgage bonds.  *  *  *  That the entire amount of bonds outstanding and unpaid, secured by the said second mortgage,  *  *  *  is the sum of $2,100,000, of which amount the sum of $850,260 was issued to secure past-due interest coupons on said first mortgage."

Further provisions of the decree important to notice are,

that any of the bondholders may become purchasers of the mortgaged property at the foreclosure sale; that the sum of $25,000 shall be paid in cash at the time of sale, and that the purchaser shall comply with his bid on the day of the sale; that "after the payment to the marshal of the sum of $25,000 in cash, of the sum bid by the purchaser at said sale, the marshal may receive from said purchaser for the balance of the sum bid at such sale, in lieu of cash, any of the outstanding and unpaid bonds or coupons secured by the said first mortgage, *at such percentage of the face value thereof as this court shall at the approval of said sale authorize and direct.*" Also, "that so much of the purchase money at said sale as shall be necessary to pay the costs of this suit as taxed, and the costs and expenses of said sale, and the amount hereby adjudged to be due to the said complainant and its solicitors, shall be paid in cash, and that the remainder of said purchase money may be paid *in cash or in said first mortgage bonds, or such of said second mortgage bonds as are by this decree held to be secured by said first mortgage* in the proportion aforesaid."

1. It is claimed by the petitioner that, in various particulars set forth in her petition, error and ambiguity are apparent in the decree; and one of the allegations upon which this claim is founded is that "it appears on the face of the decree that a cash bid of $25,000 is not sufficient to make valid and effectual the terms of the decree, in this: that the said decree provides on its face that $850,260 of the second mortgage bonds given in exchange for first mortgage coupons, with the interest thereon, shall be a first lien and charge upon all the property, real and personal, by said first mortgage conveyed, and to satisfy said $850,260 as a first lien, a sum of over $25,000 in money should and ought to be directed to be paid." This objection to the decree is founded upon a misapprehension of its scope and meaning. The decree does not give to the $850,260 a rank in advance of the first mortgage bonds. It declares that second mortgage bonds of that amount were issued in exchange for interest coupons due upon the first mortgage bonds, and are, with interest, *a lien under the first mortgage,* and entitled to be proved *under that mortgage* and

constitute *a part of the debt secured thereby.* Again, in another part of the decree, it is declared that "the sum of $850,260 was issued to secure past-due interest coupons on said first mortgage, and *is secured by said first mortgage* as aforesaid;" and, as we have already seen, it is further provided that the purchase money on the bid "may be paid in cash or in said first mortgage bonds, or such of said second mortgage bonds as are by this decree held *to be secured by said first mortgage.*" It is clear, therefore, that the second mortgage bonds to the amount of $850,260 are simply placed on the same footing as the first mortgage bonds—not as having a preference over the latter, but as being equally secured under the first mortgage with the first mortgage bonds. There was, therefore, no greater or other reason why the decree should provide for a cash payment on the bid of a purchaser sufficient to cover the $850,260, than there was for a cash payment adequate to cover the entire amount of the first mortgage bonds.

2. The mortgages provided that in case of default in payment of either the principal or interest due on the bonds secured thereby, and on written request of the holders of a specified proportion of the bonds, the trustee might sell the mortgaged property; and it was therein further provided that "the amount of the bid or purchase money of said sale may be paid and satisfied in whole or in part by the outstanding mortgage bonds, or any of them, issued hereunder, and the same shall be taken and received in whole or in part payment and satisfaction by the party of the second part, its successor, or successors, according to their value, to be ascertained and determined by the net amount arising from such sale as compared with the amount of outstanding bonds issued hereunder as aforesaid."

The decree, as we have before observed, provides that after payment of $25,000 in cash of the sum bid at the sale under the decree, the purchaser may pay the balance of his bid in outstanding bonds and coupons, secured by the first mortgage, "at such percentage of the face value thereof as this court shall, at the approval of said sale, authorize and direct."

Now, it is alleged in the petition that the decree is erro-

neous in that it does not observe or follow the terms of the mortgages as to the receipt of bonds as part of the purchase price for the property sold. The sale authorized in the mortgages was one to be made in certain contingencies by the trustee. It was a sale to be made in accordance with the stipulations of the parties. The course of procedure there prescribed was one to be pursued in case of a sale without foreclosure, and it was competent and proper for the parties to place upon the trustee certain restrictions, and to define the limits within which he must act in making such a sale. But those provisions could not bind the court if foreclosure proceedings should be instituted, and a sale should be made under its direction. In such case the sale would have to be made according to the usual course of practice in judicial proceedings, and the court would be no more bound to adopt the provisions of the mortgages, as to the acceptance from a purchaser of bonds to apply on his bid, or the proportion in which bonds should be so received, or the manner in which their value should be ascertained, than it would be bound to adopt the directions to the trustee, contained in the mortgages, as to the advertisement of the property for sale. As a test of this question, suppose the court, ignoring the provisions of the mortgages altogether, should order the property sold for cash, and in no manner authorize the payment of a bid in bonds, would that be an error of which a bondholder could complain? Clearly not. Undoubtedly, the court might adopt, so far as practicable, the method of procedure pointed out in the mortgages, but it would not be error affecting the validity of the decree not to do so, unless wrong and injustice were apparent in the decree entered by the court; and I am unable to perceive wherein the decree in the particular under consideration fails to observe the rights of all parties.

3. This brings us to another point urged against the validity of the decree, and which in some aspects connects itself with the question last considered. It is alleged in the petition, as one of the grounds on which the court should allow a bill of review to be filed, that the decree does not establish the percentage value of the bonds or coupons secured by

either of the mortgages; that in order to secure just and equitable bidding at the sale, the value of the bonds should be ascertained by proof, on reference to a master before the sale, and that without such previous ascertainment of value no bidder can know what amount of bonds or coupons he can pay on his bid. In the first place it may be remarked that the provision in question in the decree is similar to that inserted in railroad mortgage foreclosure decrees in this circuit, as I am advised by the circuit judge, whom, for certainty of information, I have consulted on the point. Obviously, the value of the bonds and coupons must depend on the value of the mortgaged property, and that value is best ascertainable by sale of the property. I do not see, therefore, how it would be possible, or at least practicable, to determine the value of the bonds, or to determine what percentage of value should be applied on the bid, before the sale transpires. There may be prior liens to be paid in the shape of intervening claims, and I cannot perceive how a proper and effectual sale can be made,—if bonds are to be applied on the bid,—unless the court is permitted to fix the rate, after the sale is reported, at which bonds shall be received. And it would seem that an attempted ascertainment of value of the bonds, before the sale, for the purpose of fixing the rate at which they may be applied on the bid, would be more likely to involve injustice, especially to small holders, than an ascertainment made subsequently, because before sale the only value susceptible of proof might be one merely nominal, while after the sale the value would be actually represented by a realized price. In this connection it is urged that the decree does not determine what amount of bonds may be taken to apply on the bid. Whether it can be said, in strictness of definition, that the sale authorized by the decree is a cash sale or not, I think it is equivalent to that. The decree provides that $25,000 in cash shall be paid by the bidder at the time of the sale; that after such payment the *balance* of the bid *may be* paid in bonds and coupons, or, as it is expressed in another part of the decree, after the payment of costs and expenses, etc., the remainder of the purchase money

*may be* paid in cash or in certain designated mortgage bonds. Certainly the court would have the power to require the entire amount of the bid to be paid into court in cash, and then to apply the money in payment of costs and upon the bonds at such a percentage as the entire bid would pay. In that case the court would receive the money and directly pay it out again in dividends on the bonds. In the case contemplated by the decree, the bonds are brought in as representing a part of the cash bid, and suitable indorsements and cancellations made, so that the transaction is made equivalent to the payment in cash of the entire purchase money, and the application of it on the bonds in the manner before indicated. Could the court have foreseen what has occurred since the entry of the decree, especially in regard to the presentation of intervening claims, it is probable that it would have required, in terms, the payment of a larger sum in cash at the time of the sale than $25,000; but I do not think that very important, because the court has the undoubted power to require a sufficient sum to meet all exigencies to be paid into court as a condition of confirming the sale. After careful consideration of the question, I am unable to perceive how injustice could result to bondholders from the terms of this decree in the particulars referred to. Every bondholder or other person is at liberty to bid at the sale. He may bid what he thinks the property is worth. He knows that the price for which the property may be sold will represent the value of the property, and will fix the value of the bonds. He knows that the proceeds of the sale must be used to pay bonds, and that they must be applied *pro rata* upon bonds. He knows, also, that the percentage so to be applied will depend upon the amount for which the property sells, and the amount of the bonds; and knowing further that if the sale is properly conducted and if he is the highest bidder he will get the property, he is left to freely and fairly exercise his judgment as to the sum he will bid. On the whole, my opinion is that the decree is not erroneous, and does not, in form or substance, deviate from correct practice in the particulars which have been considered.

4. The petition alleges that the receiver in the foreclosure action has filed a bill in this court, against D. M. Kelly and others, to set aside certain deeds of depot grounds, right of way, and other lands, which, it is claimed by the receiver, belong to the railroad company, and which, it is claimed by the defendants in said bill, belong to them; that the right of the company to said property should be adjudicated in the foreclosure suit; and that the title deeds thereof were of record before the bill in the foreclosure action was filed; and it is further alleged in the petition that the said D. M. Kelly and others, who are defendants in the action brought by the receiver to settle the title of the lands in controversy in that action, were necessary parties in the foreclosure suit, and that without their presence in that suit their legal or equitable rights to the lands cannot be cut off by the foreclosure decree, and a perfect title thereto given to the bidder at the foreclosure sale.

I am unable to see how the rights of the petitioner are injuriously affected by the facts thus alleged. It is apparent, from the allegations she makes, that D. M. Kelly and others are claiming the lands in question as their own under a title adverse to the railroad company. If they succeed in the litigation with the receiver, they will hold the lands. If they fail, then it will result that the lands fall into the general mass of property covered by the mortgages, and the title will pass to the purchaser at foreclosure sale. Such a question of adverse title could not be litigated in the foreclosure suit; and, moreover, the petitioner, in my opinion, divests herself of all right to make this objection to the decree and the foreclosure proceedings, because, in connection with her allegations on the subject, she denies that the lands in question are the property of the railroad company, and of course thereby inferentially affirms the right and title to the lands of the defendants in the action brought by the receiver.

5. But it is charged in the petition that the action to foreclose the mortgages in suit was fraudulently and collusively brought; and in the consideration of this phase of the case it is necessary to take notice of the allegations of the petition.

Those allegations, stated in somewhat condensed form, are that certain bondholders, including John I. Blair and William E. Dodge, caused the foreclosure bill to be filed; that to carry out certain schemes for getting control of the mortgaged property, and to obtain unjust and improper advantages over the petitioner and other bondholders and stockholders, Blair and Dodge retained J. P. C. Cottrill, Esq., as attorney for the railway company; that Mr. Cottrill had never before acted as the general attorney of the company, and that, immediately after retaining him, Blair and Dodge caused the bill in the foreclosure action to be filed, and a subpœna to be issued and served upon said Cottrill, as attorney of the company; that the only service which Mr. Cottrill or his firm thereafter rendered in the case was to file an answer, which had been previously prepared by the counsel for Blair and Dodge and their party of bondholders. It is alleged that neither Mr. Cottrill nor his firm had any personal knowledge of the facts stated in the foreclosure bill or in the answer thereto, and that they had nothing to do with the drafting of the answer, and were not consulted or advised with about the subject-matter thereof. It is charged that at the time the said Cottrill was so appointed attorney of the defendant company, William E. Dodge was the president of the company, and that upon his appointment as such attorney Mr. Cottrill went with the solicitor of the complainant, the Farmers' Loan & Trust Company, before the judge of this court and consented to the appointment of a receiver in the foreclosure suit; that at the time of his appointment as attorney for the company said Cottrill was shown by one of the solicitors for the complainant a letter from Dodge appointing him such attorney, and that he acted under such letter of appointment; that the appointment of said Cottrill was obtained by Blair and Dodge, and those in interest with them, for the fraudulent purpose of obtaining a fraudulent and collusive service of process in the foreclosure suit, and not with *bona fide* intent to make him the general attorney of the company to defend its interests. It is then charged, generally, that the appointment of said Cottrill as attorney, for the purpose of serving process of subpœna upon

him, was fraudulent as to the stockholders and other bond-holders of the company, not parties thereto, and was made by Blair and Dodge, and their associates, for the fraudulent and collusive purpose of obtaining service of the subpœna in the foreclosure suit. And so, it is further alleged, that such service was fraudulent and collusive, and was a fraud on the court, and upon all stockholders and bondholders who did not know or assent to the same, and should therefore be set aside, with all proceedings in the foreclosure suit subsequent to the issuing of the subpœna. It is then stated that the complain-ant, the Farmers' Loan & Trust Company, had knowledge of and colluded with Blair and Dodge in the matter of the appointment of said Cottrill as attorney for the company, and in the service of process on him, and that the petitioner had no knowledge of any of these alleged facts until the seventh day of January, 1881.

Many of these allegations are made on information and belief; but, admitting them all to be true, the question is at once suggested, wherein consists the fraud upon the petitioner, and how is she injured by the matters complained of? She cannot be heard in behalf of stockholders, for they are not here complaining. She cannot be heard in behalf of other bond-holders, for they must speak for themselves if they have been wronged. The only question is, wherein has the peti-tioner been injured or defrauded by the proceedings men-tioned? This was not the case of a fictitious action without a genuine subject-matter to support it. Here were large mortgages given to secure bonds, the interest on which was unpaid. The genuineness of these instruments, and the validity of the debt they represented and secured, are not questioned. By the allegations of the bill in the fore-closure suit, which is part of the record, it appears that the holders and owners of bonds, amounting to more than one-half of the entire issue under each of the mortgages, requested the trustee to institute foreclosure proceedings. This is not denied in the present petition, and, if true, it was the duty of the trustee to file the bill in behalf of all the bondholders. It could not concern bondholders how service of process on

the company was obtained, provided the court legitimately obtained jurisdiction of the parties. And why should not the mortgages be foreclosed, provided a reasonable proportion of the holders of bonds requested it to be done? Certainly the petitioner cannot be heard to say that it was the duty of the company to resist and obstruct a foreclosure. If the mortgages were valid, and the debt due, and if the company could not make payment,—the contrary of which the petition does not allege,—then it was the duty of the company to permit the trustee to foreclose, and the bondholders to realize their money. Nor upon such a state of facts does it seem to me that it would be a fraud upon bondholders if the president of the company were to employ counsel to act for the company, even in advancement of the foreclosure. The gist of the petitioner's allegations is that certain bondholders— one of whom was the president of the company—retained counsel for the company for the purpose of procuring service of process of subpœna in a genuine action to foreclose valid mortgages given to secure a just debt. Stockholders being silent, I am unable to perceive how the petitioner can maintain that the proceeding complained of was a fraud upon her, or a fraud upon the court.

There are allegations to the effect that the object of Blair and Dodge and their associates was to obtain ultimate control of the mortgaged property. But the proceedings to foreclose the mortgage were necessarily public. The sale following the decree must likewise be public and open to all bidders. Confirmation of the sale by the court must of necessity also be open to the resistance of any party in interest, if the sale should not be fairly conducted, or if there should be such inadequacy of price as might involve a sacrifice of the property or injury to parties interested. Considering this matter in all the points of view suggested, the manifest infirmity in the petitioner's case, upon this branch of it, is that she shows no fraud upon her and no injury to her. Attention was called on the argument to certain admissions contained in the answer of the company filed by Cottrill & Cary in the foreclosure suit as prejudicial to the rights and

interests of the petitioner. But it is not perceived how or wherein they could operate to her injury; and, moreover, the truthfulness of those admissions is nowhere denied or questioned in the present petition.

I have examined with care the cases cited by petitioner's counsel: *Lord* v. *Veazie*, 8 How. 251; *Gaines* v. *Hennen*, 24 How. 553; *Wood Paper Co.* v. *Heft*, 8 Wall. 334; *Cleveland* v. *Chamberlain*, 1 Black, 419; and *Forrest* v. *M., S. & L. Ry. Co.* 65 Eng. Ch. Rep. 125. This opinion has been already extended to such length that I forbear to enter upon a review of those cases further than to say that I deem them upon their facts, and in the principles they involve, inapplicable to the case at bar.

6. Incorporated in the petition is a copy of the bondholders' agreement and proposed plan of reorganization of the Green Bay & Minnesota Railroad Company, which, it is alleged, Blair and Dodge and their associates seek to consummate to the alleged detriment and injury of other bondholders and of stockholders. I have been somewhat at a loss to determine just the extent to which this extrinsic matter should be considered by the court as bearing upon the validity of the proceedings in the foreclosure suit, or as affording ground for the petitioner to file a bill of review. Certainly it can only be considered to the extent that the particular interests of the petitioner may be involved. The agreement appears to be a voluntary one, and all holders of bonds, second as well as first mortgage bonds, with certain stockholders of the company, are permitted to participate in it. The provisions are such as, I believe, are usual in such agreements. The plan of reorganization contemplates the issue of first and second mortgage bonds, and of preferred and common stock, by a new company, and provides for the exchange, on certain terms and at certain rates, of bonds and stock of the old company for bonds and stock of the new. Such equality of footing as may render secure the various interests of the parties who may enter into the arrangement, appears to be accorded to different classes of bondholders and stockholders; and on the whole, in considering this branch of the case, I do no not think that

such grounds of objection are presented, or such probable injury to petitioner is shown, as makes the petition sustainable.

7. Finally and generally, it may be stated that even if the court were in doubt as to the disposition that should be made .of the present petition, it would be a serious question whether that doubt would not have to be resolved against the petitioner because of her own *laches*. As before stated, the bill in the foreclosure suit was filed in January, 1878. Since that time the bill, subpœna, record of service of subpœna, and the answer have been on file. The decree was entered in April, 1879. Nearly two years afterwards, and within a few days before the sale was advertised to take place, the present petition was filed. Certainly the delay has been great, and it can hardly be said that it is sufficiently excused by any averments to that end contained in the petition. Then it is not certain that the petitioner, as the holder of the bonds described in her petition, has any real interest in the subject-matter of this controversy. Her bonds are secured by the second mortgage. There is no allegation that they are included in the $850,260 of second mortgage bonds which were issued to take up past-due first mortgage coupons, and which became secured by the first mortgage. Nor is there any averment that the mortgaged property is of sufficient value to pay more than the first mortgage bonds. There is, in fact, no allegation whatever touching the value of the property covered by the mortgages. And in conclusion, upon all the grounds, and for the various reasons stated, the demurrer to the petition will be sustained, and the petition will be dismissed.