HUBERT B. GATES *vs.* THE BOSTON & NEW YORK AIR LINE RAILROAD COMPANY AND OTHERS.

Where a railroad company is chartered with power to take private property and to construct and operate its road, the authority given is in the first instance permissive merely, and no obligation rests upon the company to exercise the powers granted.

But where the company has taken private property and constructed its road, it has come under an obligation to carry into effect the objects of its charter, and its capital stock, franchises and property stand charged primarily with this public trust.

Where such a company is empowered to issue bonds and secure them by a mortgage of its franchise and all its property, the mortgagees take the mortgage subject to this trust.

Where such a company fails and the mortgage has to be foreclosed, the legislature has full power to authorize the bondholders, by a vote of a majority, and with an equal opportunity to all, to reorganize as a new corporation, with the rights of the old corporation, such authorized action being merely a mode of securing the performance of the paramount public trust.

And a dissenting minority have no private rights that can be successfully asserted against such action.

Where a mortgage was given to secure a large amount of coupon bonds which were to run twenty years, and contained a provision that they might be considered due by any bondholder on default of interest for six months and that the mortgage might then be foreclosed, it was held that each bondholder took his bond subject to this right of his co-bondholders, and could not, by electing not to have his own bond become due, obstruct the action of the majority.

Where the mortgage is made, under a provision of the charter, to the treasurer of the state, in trust for the bondholders, the treasurer in executing his trust may exercise a wide discretion within the scope of his powers.

And any bondholder, having no notice of the proceedings taken by the treasurer and by the majority of the bondholders with regard to

the foreclosure of the mortgage and reorganization of the company, would yet be regarded as a party to them, represented by the trustee and the other bondholders.

There is no reason why, subject to legislative and judicial control, the majority in interest in common property, indivisible in its nature, consecrated to public use, should not so use the property as to advance the private interests in it and promote the public use.

[Argued October 7th—decided December 14th, 1885.]

SUIT for an injunction restraining the defendant corporation from ratifying a lease of its road, for the appointment of a receiver and for an account; brought to the Superior Court in Middlesex County, and heard before *Phelps, J.* Facts found and judgment rendered for the defendants. Appeal by the plaintiff. The case is sufficiently stated in the opinion.

*S. L. Warner* and *S. A. Robinson*, for the appellant.

1. The charter granted to the defendants, by which they were enabled to organize as a new corporation, and under which they claim to have extinguished the rights of the plaintiff under the mortgage of the old company, is so far unconstitutional and void. In any aspect of the case, even the most favorable to the defendants, the effect of the proceedings authorized by the new charter, if a legal effect is given to them, is to destroy the plaintiff's title to his own property, by an arbitrary act of the legislature and without the intervention of the court. In no possible aspect of the case can it be claimed that the plaintiff was not the owner of such share of the mortgage property, including the franchise, as his bonds bore to the whole issue. On this point it is immaterial whether that *pro rata* ownership was a legal or equitable interest, nor whether the foreclosure extinguished the lien on that particular property. The plaintiff had still an interest in the property, and his bonds, though not paid, were the muniments of his title thereto. In his bonds he had an absolute, unqualified ownership. It is even claimed that the legislature had the power to vest the property in the defendant corporation free from the trust character imposed by the contract; that the trustee by a

simple release may denude himself of the trust without the consent of the *cestui que trust* or the intervention of a court of chancery. By this it practically destroyed the plaintiff's bonds, though not due and not paid. It extinguished his equitable title to the mortgage estate as such without his consent, and, more than all this, it set up a corporation with power to liquidate the plaintiff's debt and mortgage interest on their own terms and by the payment of their own stock. It makes it compulsory on the defendants to exchange their bonds and surrender them, not for any determined or adjudicated value, not for cash, not for money, or any recognized legal tender, but for stock in a creature of the state. An act which deprives the creditors of a corporation of all remedy against its property, impairs the obligation of a contract and is void. *Curran* v. *State of Arkansas*, 15 Howard, 304, 311; *Stinger* v. *Knapp* 31 Verm., 1. A trustee cannot denude himself of the trust, or delegate it, without the consent of the *cestui que trust.* Hill on Trustees, 175; *Thrall* v. *Spencer*, 16 Conn., 142; *Goddard* v. *Prentice*, 17 id., 553. And the legislature cannot by an enactment vest the private property of one corporation in another without its consent. *Enfield Toll Bridge Co.* v. *Connecticut River Co.*, 7 Conn., 48; *Derby Turnpike Co.* v. *Parks*, 10 id., 541. There are no equities, no legal rights, attaching to this property as among or against any one of the several bondholders, which do not accrue to any other separate holders of securities, secured by mortgage, after foreclosure. They cannot be characterized in any other way than as *joint and equal owners* of the mortgaged property, having no other priority than that stipulated in the bond. In no sense is the right of one subject to the domination of others, even a majority, any more than in any other joint ownership of tenants in common. But it is claimed that, without impairing the obligation of the contract, it was in the power of the legislature to change the trustee of the deed or authorize other parties to take the trustee's title. We insist that one of the chief values of a security of this kind is the

personal character and standing of the trustee. The provision of our general statutes authorizing the class of mortgages to be made to the state treasurer, as in this instance, was made to give a greater value to the security. The purchaser of the bond in this instance took a bond with a trustee, who, with his successors, were the chief financial agents of the state. His position indicates his fitness for the trust, his knowledge of business, and aptitude for the performance of all the duties of the office. Moreover, the trust being authorized and imposed by sanction of the public law, the purchaser has a right to rely on a breach of its duties involving the trustee in the penalties of fine, imprisonment or impeachment, which the law of all society imposes. *Knapp* v. *Railroad Co.*, 20 Wall, 121, is much like this case. That case presents these facts : A mortgage of the Western Vermont Railroad Company to Knapp and Briggs, trustees; an absolute foreclosure by the trustees; afterward the Bennington and Rutland Railroad was organized; their charter authorized a majority of the bondholders to take the property, form a new corporation, and be substituted in the place of Knapp and Briggs; the act of incorporation vested the corporation with all the powers, privileges and franchises of the old road; the road had an outstanding lease, and afterwards the legislature declared the new corporation entitled to receive the rents accruing under the leases foreclosed. A suit was brought in the name of Knapp and Briggs, trustees. The case showed that they did not institute the suit and did not know of its being brought, and disclaimed all responsibility for it. Of course their names were used by some bondholder. The issue was on the rights conferred by the charter, and in effect the same as here presented. The court says: "It is not in the power of the state legislature without the consent of the *cestui que trust* to substitute a new trustee in place of the persons named in the mortgage. This would impair the obligation of the contract. The salability of railroad bonds depends in no inconsiderable degree upon the character of the persons who are to manage the trust.

If these persons are of well known integrity and pecuniary ability the bonds are more readily sold than if it was not the case. * * * To change them is to change the contract in an important particular, and this cannot be done without the consent of the parties for whose benefit the trust was created." The trustees, so far as the record discloses, have not been discharged of their trust, nor has the trust in fact been closed, for there are bonds outstanding which have never been paid or converted into the stock of the new corporation. It can make no difference whether these bonds are few or many. The trust continued until all are paid, unless in the meantime the trustees are discharged.

2. As to the power to lease. Of course it is conceded that the corporation has the general power to lease. Nor can it be denied that a general power is vested in the corporation to determine the form and character of the lease. But every corporate power of a general or specific character is subordinate to the general purpose of the organization. More than all, this power is subordinate to the principles of natural justice and equity attaching to the rights of the minority. And in the application of these principles the law treats the shareholders as having entered into a contract with the corporation and among themselves to expend their money to favor the prosecution of the scheme of the charter, not only as to the earning of the income but in its distribution. In this aspect the corporation is treated as among the stockholders as a co-partnership of perpetual duration. This lease in effect changes the whole purpose and scheme of the corporation. The common stockholder bought a right to the future earnings. The undertaking of the corporation and individual members was to preserve that right. It was not in the power of the stockholders against a single dissenting voice to vote that no dividends should be paid on this common stock, and what they could not do directly they cannot do indirectly by means of a lease. *Black* v. *Del. & Raritan Canal Co.*, 24 N. Jer. Eq., 455. " It is not in the power of seven shares out of eight to alter the manner in which it

has originally agreed the profits should be divided." Lord
ELDON in *Const* v. *Harris*, Turner & Russ., 496, 525;
Green's Brice's Ultra Vires, 552. And we insist that we
are within the rule recently promulgated by the Supreme
Court of the United States in the case of *Hawes* v. *Oakland*,
104 U. S. Reps., 460, where the court says an injunction
will be sustained against a corporation at the instance of a
stockholder, "where the majority of the shareholders are
oppressively and illegally pursuing a course in the name of
the corporation, which is in violation of the rights of other
shareholders, and which can only be restrained by the aid
of a court of equity."

*S. E. Baldwin*, for the appellees.

STODDARD, J.\* The New Haven, Middletown & Willi-
mantic Railroad Company was chartered by the General
Assembly of the state of Connecticut in the year 1867, for
the purpose of constructing and operating a railroad from
the city of New Haven to the village of Willimantic, and
wholly within the territorial limits of this state. By its
charter that corporation was invested with all the usual
franchises and powers conferred upon railroad companies,
including, of course, the right to take private property by
the exercise of the right of eminent domain.

The capital stock was $3,000,000, with the privilege of
increasing the same to an amount not more than $6,000,000.

The company was authorized to borrow money to an
amount not exceeding at any one time one half of the
amount actually expended for the construction and equip-
ment of its road, and to secure repayment of the same by
its bonds with or without coupons. Provision is made
in the charter for securing these bonds by the execution of
a mortgage of the "railroad and all its property, rights and
franchises," to the treasurer of the state and his successors
in office, in trust for the holders of the bonds.

---

\* Judges *Beardsley* and *Stoddard* of the Superior Court sat in the place
of Judges *Pardee* and *Granger*, disqualified by interest.

In pursuance of its chartered powers the company proceeded to build its railroad, and in 1869, having obtained stock subscriptions and partially completed the road, issued coupon bonds, either negotiable or not at the option of the holder, to the amount of $3,000,000, and secured the payment thereof by a mortgage, as provided by the charter. In that mortgage it is recited that the company desired to borrow money " for the purpose of constructing and equipping said railroad," and proposed to make and issue such bonds "pursuant to the power and authority to that effect in said charter contained." The bond itself states that it is secured by a "first mortgage to the treasurer of the state of Connecticut upon the railroad of said company and all its property, rights, and franchises under its charter," and stipulates that, "should any of said interest coupons remain unpaid for six months after presentation and default, the principal sum secured hereby shall, at the option of the holder thereof, become due immediately."

The granting clause of the mortgage also conveyed the railroad, its appurtenances, rolling stock, and all other real and personal property, particularized at length, "which may now belong, or may at any time hereafter belong to said company, and be used as a part of said railroad, or be appurtenant thereto, or necessary for the construction, operation or security thereof; and also all the property, rights and franchises of the said company under its charter, and every part thereof, together with the tolls, income, issues and profits thereof, and all rights to receive the same, and everything necessary for the completion and operation of the road." In the habendum clause of the mortgage deed it is provided that the state treasurer in his official capacity is " to have and to hold the said property," &c., "subject to the terms and stipulations of said bonds and the provisions of the said charter under which the said company derives its powers."

Default was made in the payment of the interest, and under the terms of the bond and mortgage more than a majority in value of the bondholders elected that the prin-

cipal sum should be then due, and at their instance the then treasurer of the state brought his petition in equity to the May term, 1875, of the Superior Court, to obtain a decree of strict foreclosure of the mortgage. Such decree was had, a majority in value of the bondholders and the creditors being parties thereto. A plan of reorganization of the railroad had been proposed by a majority in value of the bondholders, which resulted in the foreclosure, and the passage by the General Assembly of the act incorporating the "Boston & New York Air Line Railroad Company."

A scheme for the re-organization of the management and ownership of the railroad having been assented to by the parties in interest, was referred to in the foreclosure decree. The time for redemption expired in June, 1875, and the foreclosure thereby became absolute.

On the 8th day of June, 1875, the General Assembly incorporated the new company. The act of incorporation recites that the interest of the bonds remains unpaid since November 1st, 1872; that foreclosure proceedings in behalf of the holders of the bonds are pending, &c., and that public convenience and necessity require a considerable further expenditure to complete and equip the road.

The capital stock consisted of forty thousand shares of $100 each, thirty thousand of which is preferred stock, and ten thousand common stock. The preferred stock is to be issued "only in exchange for the first mortgage bonds of said company, at the rate of five shares for every bond of $500, and ten shares for each bond of $1,000."

The common stock is to be issued, first, for overdue and unpaid coupons detached from the bonds, and second, in satisfaction of certain legal and equitable claims existing against the road prior to the time the decree of foreclosure became absolute. The charter then provided that when a majority of the bonds had been exchanged for the preferred stock, and upon some other conditions, the trustee should convey to the new corporation all his title and interest in the trust property in fee simple, and then provided that such conveyance "shall be effectual to discharge him for-

ever from said trust, and to vest said premises with all the rights and privileges of the old corporation."

The charter then provided that no dividends shall be declared upon the common stock until dividends have been declared out of the net earnings of the railroad upon all of the thirty thousand shares of preferred stock, equal to seven per cent. a year thereon from the date of the last coupons on the first mortgage bonds, default on which was made prior to the time when the title of the trustee under the mortgage to the mortgaged premises became absolute by foreclosure. Then it is provided that the new corporation may issue mortgage bonds upon its property, under certain conditions and stipulations, by a vote of three-fourths of all the stockholders.

The plaintiff owned, prior to the re-organization scheme, bonds to the value of $2,500, and " has never personally been a party to, or participated in, any of said proceedings, nor authorized any one to act for him or represent him, or been personally served with notice, nor has assented to them, and has not elected to have his bonds due, and still claims them as valid subsisting securities under said original first mortgage. He was not aware that said charter had been granted to the Boston & New York Air Line Railroad Company, or that said foreclosure decree had been made."

The broad claim is now made by the plaintiff, that, as he was not personally a party to the re-organization scheme, had no actual notice of it, and has not assented that his bonds should mature and the trustee be discharged, therefore his bonds with their coupons are outstanding subsisting obligations of the old corporation, charged upon this railroad property, and that either by an absolute sale, or by operation of the railroad by the trustee, said property and franchises must be appropriated to the discharge of the obligations held by him, notwithstanding that a different mode of appropriating the property in liquidation of the bonds has been agreed upon by a majority of his co-bond-

holders, and has been sanctioned by the state and by a court of equity having jurisdiction of the subject-matter.

The plaintiff's contention in this behalf rests upon his assumption that he has a constitutional property right to have the property appropriated in the manner claimed by him.

In making this claim the plaintiff ignores, or subordinates to his own claim, both the private rights of his co-bond-holders and public rights vested in trust in the state, while upon every true theory and exposition of his contract the rights of the public are superior to his private rights, and the rights and interests of his co-bondholders are equally with his own to be protected by the law. The plaintiff's argument treats this matter as one of strict legal private right of an individual creditor, against or to private property of an individual debtor, instead of a claim of exceptional character upon property of peculiar nature, in which private rights of others and the right of the public exist, which must be regarded and protected.

One public right consists in the continuous uses of the railroad, its franchises and corporate property, in the manner and for the purposes contemplated by the terms of the charter. All these corporate franchises and this property are held subject to, and charged with, this obligation.

It is true that the charter is permissive in its terms, and probably no obligation rests upon the corporation to construct the railroad; the option to exercise the right of eminent domain and other public rights is granted. And when that option has been made, and the corporation has located and constructed its line of track, exercising the power of the state in taking property of others, and in so locating and constructing its road, has invited and obtained subscriptions upon the implied promise to construct and operate its road, has commenced to operate the road under the granted powers, thereby inducing the public to rely, in their personal and business relations, upon that state of affairs; by so accepting and acting upon the chartered powers a contract exists to carry into full effect the objects

of the charter, and the capital stock, franchises and property of the corporation stand charged primarily with this trust. The large sovereign powers given by the state to railroad corporations are granted and exercised only upon the theory that these public rights are to be used to promote the general welfare. Having exercised those powers the corporation has no right against the will of the state to abandon the enterprise, tear up its track, and sell its rolling-stock and other property, and divide the proceeds among the stockholders.

The possible effects of the exercise of such a claimed power are utter disaster to the great interests of the state, certain destruction of private property in which whole communities created and existing upon the faith of the continuous use of the chartered powers are interested, and, indeed, the life of the citizen as well as his property rights are thus jeopardized. Upon principle it would seem plain that railroad property once devoted and essential to public use, must remain pledged to that use, so as to carry to full completion the purpose of its creation; and that this public right, existing by reason of the public exigency, demanded by the occasion, and created by the exercise by a private person of the powers of a state, is superior to the property rights of corporations, stockholders and bondholders.

To this effect also is the weight of authority. In the following cases are illustrations of the general principle: High on Mandamus, §§ 315, 316, 317; *State* v. *Hartford & New Haven R. R. Co.*, 29 Conn., 538; *R. R. Commissioners* v. *Portland & Oxford R. R. Co.*, 63 Maine, 278; *Attorney Gen.* v. *West Wisconsin R. R. Co.*, 36 Wis., 466; *The People* v. *Albany & Vermont R. R. Co.*, 24 N. York, 261; *The People* v. *Long Island R. R. Co.*, 31 Hun, 127; *Attorney Gen.* v. *Southern Minnesota R. R. Co.*, 18 Minn., 40; *In re N. Brunswick & Canada Ry. Co.*. 1 Pugsley & Burb., (N. B.,) 667; *York & North Midland Ry. Co.* v. *The Queen*, 1 El. & Bl., 858.

The American and English cases which seemingly doubt these propositions place their conclusion upon the con-

struction of the particular chartered powers and obligations.

In the case at bar there are special provisions of the charter and of the bond and mortgage which indicate an intent to impose this trust characteristic upon the franchise and property of this corporation. By the charter the corporation was given power to construct and operate the whole intended line of railway, to obtain subscriptions to the capital stock, and to borrow money and issue its bonds, and mortgage its property therefor, for that special object and purpose. The bond on its face purports to be part of an issue secured by mortgage on this railway property and franchises. The mortgage securing the bond recites that the corporation has obtained capital stock-subscriptions "for the purpose of constructing and equipping said railroad," states that the corporation desires to borrow money and issue bonds therefor "pursuant to the power and authority to that effect in said charter," covers not only the visible property but the franchise to operate the road, and conveys the property and franchises · "subject to the terms and stipulations of said bonds and the provisions of the said charter under which the company derives its power."

It is apparent that the bondholders loaned the money. and took their bonds with the security with full notice that the security for the loan was first pledged to the performance of a public trust.

The necessary conclusion is that the state has a right to enforce the continuous exercise of the corporate powers and franchises for public use, to the exhaustion of the value of such property and franchises; and this is true, no matter what private right may embrace the title of the property.

In this state, irrespective of legislative or judicial authority in the special instance, the effect of a foreclosure is to vest absolutely the property of the mortgagor in the mortgagee. It simply cuts off the right of redemption existing in the mortgagor, and thereafter the mortgagee stands with reference to the mortgaged property in the same relation as did the mortgagor. He has the title of the

former owner of the equity, and nothing more. He holds the property subject to all charges, duties, pledges and equities existing prior to the execution of the mortgage deed. We have not adopted the practice of selling the property upon foreclosure. Necessarily, therefore, if the trust mortgage was rightfully foreclosed, and the title vested in the trustee in trust for the first mortgage bondholders, the trustee and the beneficiaries of the trust continue to hold the property, subject to the same limitations, duties and obligations resting upon the original corporation, including of course the obligation to execute the public trust cast upon the mortgaged property by devoting it to the public use for which it was created. This property could not be relieved from this trust without the acquiescence of the state. But the state has explicitly declared the public intent that the franchises and property vested in these bondholders should continue to be devoted to the public use declared in the original charter, and has created a new corporation for that purpose. In the organization, control and management of this new corporation, and in its property and franchises, the plaintiff is, by the incorporating act, entitled to share proportionally with all the other bondholders. The new corporation is an instrumentality adopted by the state, with the acquiescence of a majority of the bondholders, for carrying into effect the original design, and devoting the property to the only use which the law of its creation permits; and in thus applying the trust property to the object and purposes of the trust, no right of the plaintiff is impaired, so long as he retains his original *pro rata* share in the trust property, subject to the execution of that trust and the expenses necessarily incident thereto.

So too in relation to the other bondholders, it is manifest that each bondholder enters into contract relation with each and all of his co-bondholders. His right to appropriate the security in satisfaction of his bond in such lawful manner as he may choose, is modified by the same existent right in every other holder. His absolute right of control is limited not only by the express provisions of the bond

and mortgage, but also in great measure by the peculiar nature and character of the security. *Canada Southern R. R. Co.* v. *Gebhard*, 109 U. S. Reps., 534, 537. "To allow a small minority of bondholders, representing a comparatively insignificant amount of the mortgage debt, in the absence of any pretence, even, of fraud or unfairness, to defeat the wishes of such an overwhelming majority of those associated with them in the benefits of their common security, would be to ignore entirely the relation which bondholders secured by a railroad mortgage bear to each other. Railroad mortgages are a peculiar class of securities. The trustee represents the mortgage, and in executing his trust may exercise his discretion within the scope of his powers. If there are differences of opinion among the bondholders as to what their interests require, it is not improper that he should be governed by the voice of the majority, acting in good faith and without collusion, if what they ask is not inconsistent with the provisions of his trust." *Shaw* v. *Railroad Co.*, 100 U. S. Reps., 611, 612.

This mortgage security is an entirety ; it is indivisible, and there can be but one foreclosure of that mortgage. The bond on its face provides that "should any of the said interest coupons remain unpaid for six months after presentation and default, the principal sum secured hereby shall, at the option of the holder hereof, become due immediately ;" and the mortgage has substantially the same provision. A majority of the bondholders exercised such option, and their bonds matured.

A statute authorized the trustee to foreclose the mortgage. That power probably resided in the trustee irrespective of that statute. The law of the place where a contract is made is part of the contract, as if incorporated in terms therein. The holders of these bonds hold them subject to that law. When it was provided in the bond and mortgage that the bonds were payable in twenty years from date, it was also provided by the bond, the mortgage, and the law, that under certain circumstances, at the option of the bondholders and the trustee, the bonds should mature

and the mortgage be foreclosed before that time, thus preventing the contemplated running for twenty years. The provision that the bond should continue for twenty years an outstandiag subsisting security, if any existed, was with reference to the corporation. The provision that the bonds by the action of the bondholders might mature before that time, was in reference to the co-bondholders. And while it would impair the obligation of a contract, if such contract existed, so far as the corporation is concerned, to change the time of maturity, it does not have that effect when the co-bondholders proceed upon their common and undisputed right to cause the bonds to mature, and by foreclosure to discharge the bonds by taking the property in a legal way.

*Primâ facie* the foreclosure of the mortgage security operated to discharge the mortgage indebtedness. The equitable title of the property was in the beneficiaries of the trust. The trustee was not selected because of his personal fitness or qualities; he was a state official, as are also his successors in office, designated by law as matter of convenience and public policy, and not selected by contract of the parties to the mortgage. He had no active duties in relation to the trust except those imposed by statute and the charter. And this charter was open to repeal. In these particulars the rights of the beneficiaries under the trust to the continuance thereof are very different from the rights existing under an ordinary active trust created by act and contract of the parties.

When the legislative power, which upon grounds of public policy created the trust, upon like grounds willed that such trust should cease, and vested the property, absolutely denuded of the trust, in the beneficiaries, at the instance of a majority in value of them, no right of a dissentient beneficiary is affected. The trust does not rest upon contract, and was created with the express reservation that the state might at will terminate it.

The purposes of the trust had been accomplished. The property had been appropriated by the foreclosure, so far as it could be by the parties, to the discharge of the bonds,

and the scheme of re-organization provided for the distribu-
tion of the trust property among those entitled to it, subject
to the duties and obligations to the public originally fixed
upon it.    This distribution was sanctioned by the judgment
of a court of equity having jurisdiction.    The effect of these
proceedings was to vest in the bondholders all the property
and the franchises of the original corporation that could be
transferred by judicial proceedings.    But the then owners
of the corporate property were not a corporation; they
were simply an aggregation of common owners; but it is
obviously impossible for a numerous body of part owners
widely scattered in many jurisdictions, and varying from
time to time in the personal composition of that body, to
operate a railroad; so it is equally inadmissible as a ques-
tion of public policy that the attempt should be made.    The
General Assembly, therefore, provided for the new corpora-
tion, the stock of which represented the interest of the
owners of the property.    This or some similar course must
be pursued, and it seems to be suggested in the case of
*Sturges* v. *Knapp*, 31 Verm., 1, cited by the defendants.
This was a case where the court regarded the trustees as
" selected, doubtless, with reference to their capacity and
responsibility for this very contingency both by the cor-
poration and the *cestuis que trust*, and neither of these parties
had stipulated to deal directly with the other, but only with
the trustees as the responsible party."    Page 55.    " The
trustees seem to have been selected for this very office,
among others, of controlling and managing the property in
case of forfeiture and surrender, as trustees for the benefit
of the *cestuis que trust*, in order to make it available for the
payment of the bonds, both interest and principal.    This
must be so until some organization of the bondholders, and
the acquiring of some capacity to act by a majority, or in
some such way as to enable them to discharge this new
class of duties thrown upon them by the forfeiture of the
condition of the mortgage and the surrender of the road
with its incidents and fixtures."    Pages 56, 7.

To these legislative and judicial proceedings, enactments

and decrees the plaintiff was a party represented by the trustee and a majority of his co-bondholders. The interests of all persons are bound by a public act of the legislature acting within the scope of its jurisdiction. And it is manifestly impracticable that provision should be made for actual personal notice to all the bondholders under railroad mortgages of judicial action in reference thereto. The bonds are negotiable, passing by delivery from hand to hand, and scattered, in many instances, to all parts of the civilized world. Power is therefore lodged with the trustee to exercise a wide discretion in reference to the administration of his trust, to apply to the courts for judicial action when deemed for the best interest of the *cestuis que trust*, and to bind them in relation thereto. And the familiar practice in chancery proceedings where it is practically impossible to bring by personal notice all individuals of a numerous class into court, is to proceed with a sufficient number in that interest to properly represent it.

The designation of a state official as the trustee provides a person uninfluenced by personal considerations, independent of the action or control of any portion of the bondholders, and who may be relied upon to carry into full effect the original design of his trust.

A trust of the character in question can be determined by the decree of a court of equity upon proper occasion, certainly at the request of a majority in interest of the *cestuis que trust*, and, at all events, when fortified by the concurring sovereign will of the state, and when the proportionate interests of all the owners of the property are preserved, and the estate is applied to the use for which it was created, and subject to which it is held at all times and by all persons.

A mortgage is provided for in the scheme of re-organization, to be issued by the new corporation, in the first place to pay or secure the payment of certain sums contracted in operating the road while held in trust, and, in the second, to provide for the future operation of the road by the new corporation.

It results from the view that we have taken of the contract with the bondholders, that these are objects within the scope of their contract, and that the property is lawfully subjected to this prior mortgage to accomplish these ends.

So far as the common stock is concerned, it is provided by the charter that no right to a dividend upon this stock is acquired "until dividends have been declared out of the net earnings of said railroad upon all of said thirty thousand shares of preferred stock, equal to seven per cent. a year thereon from the date of the last coupons on said first mortgage bonds, default on which was made prior to the time when the title of the trustee under said mortgage to the mortgaged premises became absolute by foreclosure." Thus is secured to the holders of the bonds the rate of interest originally contracted for, if the property should earn enough to pay that amount.

A question is made as to the power to lease. It is not necessary to dwell on this subject here; the substance of the matter is disposed of in the case of the town of Middletown against the same corporation, a companion case to this, and argued in connection with it. (*Post*, p. 351).

This additional suggestion may be made in this case, that the charter of the first corporation gave the same power to lease this property that is given to the new corporation; and, as has been already stated, upon the foreclosure the franchises and property of the old corporation were taken and held by the plaintiff and his associates, subject to the limitations, restrictions, and chartered powers and regulations as to the performance of public duties that were imposed upon the first corporation; and there are no facts in this case to indicate that the lease in question was not for the best interests of all concerned, both private persons and the public generally. There is no reason why, subject to legislative and judicial control and direction, the majority in interest in common property, of indivisible nature, consecrated to public use, should not so use that property as to advance the private interests in that property and secure the public welfare.

There is no error in the judgment of the Superior Court.

In this opinion the other judges concurred.