[S. F. No. 7080.   In Bank.—February 3, 1916.]

## JOHN GINTY et al., Appellants, v. OCEAN SHORE RAILROAD COMPANY (a Corporation) et al., Respondents.

RAILROAD CORPORATIONS—REORGANIZATION COMMITTEE OF BONDHOLDERS —CONSTRUCTION OF AGREEMENT COVERING DEPOSIT OF BONDS.—In an action by certain bondholders against their committee in a railroad reorganization to enforce the trusts under which their bonds were deposited with the committee, and to have declared void the reorganization of the railroad, it is held that the first agreement of bondholders shown in this case, which was drawn with the purpose of conferring plenary powers upon the committee, as supplemented by the later agreement here shown, amounted, so far as the plaintiff bondholders here are concerned, to an agreement upon the part of the committee that it would first use its endeavors to find whether a reorganization could be effected upon the plans and lines laid down in the second agreement, with such departures therefrom as might be necessary to the accomplishment of this end, but failing the ability to do this thing there was still in reserve their broad powers to effectuate any other organization which in their judgment seemed to be best and for the best interests of the bondholders.

ID.—POWERS WHICH CAN BE CONFERRED ON COMMITTEE BY BONDHOLDERS. The bondholders of a railway company may by agreement confer such powers as they see fit on the committee appointed to represent them, and may agree in advance that their bonds shall be subjected to any plan of reorganization which the committee may adopt.

ID.—FORECLOSURE BY BONDHOLDERS — DUTIES TOWARD STOCKHOLDERS AND CREDITORS.—The bondholders of a railroad upon foreclosure have the unquestioned right without regard to any of the equities of the stockholders or creditors to foreclose their lien and bid in the properties.

ID.—USUAL FORM OF REORGANIZATION.—A plan of reorganization, whereby the old bondholders become the stockholders of the new railway company, is not unusual, and has been declared by the supreme court of the United States to be the best way of effecting such reorganization,—"that is to say, reorganizing the enterprise on the basis of existing mortgage as stock, or something which is equivalent, and by a new mortgage with a lien superior to the old to raise the money which is required."

ID.—SUIT TO ENFORCE TRUST AGAINST COMMITTEE—REFUSAL TO ALLOW AMENDMENT TO COMPLAINT.—It is not error to refuse to allow a party plaintiff, in a suit by bondholders to enforce a trust against the reorganization committee, and to have declared illegal the reorganization of the railroad, to file an amendment to the complaint, which amendment did not allege that the bonds referred to had ever been deposited with the committee under the reorganization agreement sued upon.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. James M. Seawell, Judge.

The facts are stated in the opinion of the court.

Morrison, Dunne & Brobeck, Edward Lynch, Stratton, Kaufman & Torchiana, W. W. Kaufman, Geo. T. Hatfield, and J. Howard Smith, *in pro. per.*, for Appellants.

McCutchen, Olney & Willard, Edward J. McCutchen, and A. Crawford Greene, for Respondents.

HENSHAW, J.—This action was brought to enforce a trust, and in enforcing it to have declared void the reorganization of the Ocean Shore *Railway* Company into the Ocean Shore *Railroad* Company, defendant. Added as defendants to the corporation are the members of the reorganization committee, the trustees who effectuated that reorganization: John Ginty, plaintiff, is or was a bondholder of the Ocean Shore Railway Company. After the commencement of this action he was joined by other bondholders in seeking the relief indicated. The court in equity found against all of the

contentions of the plaintiffs and gave its decree for defendants. From that decree this appeal has been taken, and all of the evidence is presented for consideration. This brief indication of the nature and result of the action it is necessary to follow with a detailed statement of fact.

The Ocean Shore Railway Company was organized as a railroad corporation under the laws of the state of California. It purposed to construct, build, and operate a railroad extending along the Ocean Shore from San Francisco to Santa Cruz. It was capitalized for five million dollars, and all of its capital stock was subscribed, the stock owners having paid on their holdings approximately two million two hundred and fifty thousand dollars. It had also issued its bonds in the sum of five million dollars under a deed of trust executed to the Mercantile Trust Company of San Francisco. These bonds had been sold to and were owned by many persons. In November, 1909, the company defaulted in the payment of interest upon its bond coupons, and again defaulted on May 1, 1910. The Mercantile Trust Company, pursuant to the provisions of the deed of trust, then declared the principal and interest of the bonds to be due, and on June 7, 1910, gave notice of sale in accordance with the provisions of the trust deed empowering it so to do. Prior to this date (in December, 1909), a creditors' bill was filed by the Baldwin Locomotive Works in the federal circuit court against the railway company. Answer thereto was filed and a receiver was appointed by the court. He took charge of the railroad property on that date. Following the notice of sale so given by the Mercantile Trust Company the stockholders and creditors of the company (other than the bondholders) caused the Mercantile Trust Company to be made a party to the action in the federal court. It obtained from that court authority to proceed with its sale under terms and conditions expressed in the court's order. At this time the financial and physical condition of the railway company and of those interested in it was, roughly stated, as follows: At the time when the sale was effectuated there was chargeable against the property the comparatively small sum of one hundred and thirty-five thousand dollars, representing the expenditures of the receiver. The stockholders had paid in about two million two hundred and fifty thousand dollars upon their subscriptions of five million dollars capital stock.

There was owing to the bondholders five million dollars, and there was owing to other creditors about two million two hundred and fifty thousand dollars, approximately five hundred thousand dollars of which was unsecured. The distance between San Francisco and Santa Cruz by way of the railroad is eighty-three miles. Part of the road outward from the two termini had been constructed, but there was an uncompleted gap of twenty-six miles. The road was unprofitable, in the sense that its earnings could not make a fair or indeed any return upon the money invested in it.

Under the terms of the trust deed the bondholders were empowered to use their bonds on the sale of the properties in payment of the purchase price. The usual procedure in such cases followed. The bondholders were called together to enable them in combination to use the purchasing power of their bonds effectively and to take steps looking to the reorganization of the road, in the event that the organized bondholders should become the purchasers. On July 22, 1910, at a meeting of the bondholders a committee of five was selected to represent the body. The members of that committee are the defendants in this case, saving that upon the original committee was A. C. Kains, whose place was later taken by Walter S. Martin.

On July 29, 1910, the committee approved the form of an agreement under which the bondholders of the railway company should be called upon to deposit their bonds with the committee. On August 1st following, this agreement was sent by the committee to every bondholder of the Ocean Shore Railway Company, with an explanatory letter. This agreement of July 29th, as it was called and may for convenience be called, is one of the important documents in the controversy, and therefore requires further exposition. Its importance arises from the facts that it was the first and only document signed by the depositing bondholders, and (standing alone), defines in full the powers and trusts upon which the committee acted for the bondholders. It declares its purpose to be the purchase of the properties of the railway company by and on behalf of the bondholders. Under it the depositing bondholders were to place their bonds with the Union Trust Company, "there to remain for a period of nine months from this date unless sooner withdrawn and used in

accordance with the terms of this agreement.'' When bonds
to the face value of two million five hundred thousand dollars
or upward had been deposited, then such deposited bonds
could be used by the committee in its discretion ''for the pur-
pose of applying the same upon the purchase price of the
property of said Ocean Shore Railway Company so to be
sold.'' Furthermore, it expressly authorized the committee
''to proceed with a reorganization of the said Ocean Shore
Railway on any plan deemed practicable, and to do anything
they may deem to be for the best interests of'' the bond-
holders. Expenses incurred or disbursements made by the
committee ''shall be repaid to them ratably,'' the committee,
however, serving without compensation. And finally it was
provided that ''there shall be no personal liability or respon-
sibility attached to the signers of this instrument,—that is
to say, there shall be nothing hereby implied or obligated by
signature other than the power of the disposition of the bonds
alone, said bonds only being held for any expenditures and
not the owners thereof.''

The sale sanctioned and ordered by the federal court fixed
the minimum selling price at one million thirty-five thousand
dollars, but required the payment upon the fall of the ham-
mer of one hundred and sixty-six thousand dollars cash in
payment of preferred liens under the receiver's certificates.
It was incumbent upon the committee, therefore, to be pre-
pared to pay on the sale that amount of cash. Moreover,
under the terms of the deed of trust, the bondholders who did
not deposit would be entitled to be paid in cash, on their
bonds, an amount equal to the amount credited upon the de-
posited bonds which were used in the purchase of the prop-
erties, and it was distinctly declared in the agreement of
July 29th that only the bonds of the depositing bondholders
should be liable for all necessary expenditures. It was im-
portant to the committee then to secure the deposit of as
many bonds as possible, as every bond deposited decreased
proportionately the amount which would have to be paid in
money to the nondepositing bondholders. (This narrative
must here be interrupted to direct attention to the fact that
November 3, 1910, becomes a date of consequence in this con-
sideration, because upon that date the committee adopted a
plan of reorganization, which appellants contend absolutely
concluded and bound them in all their future proceedings,

and which plan of organization admittedly is not the plan
which the committee finally put into effect.)   The problems
confronting the committee were, first, to secure money suffi-
cient for the cash payment to be made on the sale, and, second,
to secure the deposit of as many bonds as possible.   Without
the money they could do nothing, and to the securing of this
the committee first bent its efforts.   It estimated that be-
sides the one hundred and sixty-six thousand dollars payable
under the court's order, about fifty thousand dollars more
would be immediately required for the care and preservation
of the railway properties.   No bank or other financial institu-
tion would advance any money upon the security of the de-
posited bonds, and as a last expedient the members of the
committee secured an agreement called the Underwriter's
Agreement, whereby their friends pledged their personal credit
in stated amounts aggregating five hundred thousand dollars,
agreeing to pay the committee their respective proportions
of this amount to enable it to meet the expenses necessarily to
be incurred in the purchase and reorganization of the road.
The five members of the committee personally pledged them-
selves in this agreement to the sum of one hundred and thirty
thousand dollars.   This Underwriter's Agreement was as-
signed by the committee to the Union Trust Company of San
Francisco, and upon its security that institution advanced
to the committee amounts aggregating two hundred and fifty
thousand dollars, agreeing that if necessary it would make
further advancements up to four hundred thousand dollars.
Additionally the committee was called upon to pledge, and
did pledge, as security for this loan all of the bonds which
had been deposited, and finally a deed of trust to all the prop-
erties which it purchased at the sale.   Thus by these efforts
the committee overcame its immediate financial difficulties.
Touching its second problem, that of securing the bonds, prior
to November 3d bonds to the amount of two million six hun-
dred and ninety-five thousand dollars had been deposited.
By January 17, 1911, the date of the sale, a total of four
million seven hundred and eighty-five thousand dollars worth
of bonds out of the entire five million dollar issue had been
deposited, all of the depositors signing, and signing only the
agreement of July 29th.

Besides the exigency of these matters to which we have ad-
verted, and which were vital to the accomplishment of the

committee's design of purchasing and reorganizing, the equities of others were from time to time pressed upon the attention of the committee. Thus in September, 1910, the principal stockholders of the railway company appeared before the committee and suggested that "some recognition be given to stockholders and unsecured creditors." Again, on September 14th, the stockholders appearing before the committee expressed the hope that "some agreement could be made by which the claims of stockholders and unsecured creditors as well as those of the bondholders might be recognized." At a meeting of September 21st the firm of Lilly & Heins, claiming to be preferred creditors, appeared and requested that the committee agree to put in a protective bid for the property of at least three million dollars. The minutes show that the creditors "were told that while there was a moral equity in their claims, no plan of reorganization had yet been adopted and the committee was not in a position to make any promises." Plans of reorganization were proposed and considered. On September 3d such a proposed plan was prepared by Mr. Bradley of the committee. On September 23d another such plan was tendered by Mr. Martin, who subsequently succeeded Mr. Kains on the committee. On September 30th a plan similar to that proposed by Mr. Martin was adopted by the committee. On this date Mr. Bradley of the committee stated "that in view of the approaching date of sale he considered it proper to formally present a plan that had been informally discussed by the committee, and that he would recommend to the approval of the committee the following plan of reorganization, in the event of the bondholders purchasing the road." After discussion the committee "resolved the foregoing proposed plan for reorganization of the Ocean Shore Railway Company be adopted as the plan of this committee." Finally, on November 3d, the committee in like manner adopted another plan, which the appellants in the court below and here contend defined and circumscribed the committee's powers and limited its activities to the effectuation of the adopted plan, with such modifications and with such modifications only as might be necessary to accomplish the main purposes, but not permitting any radical departure from those expressed purposes. The minutes show that this plan, like the plan of September 30th, was adopted. It in terms provided for the organization of a corporation

with a capital stock of nine million dollars and a bonded indebtedness of nine million dollars. Of this bonded indebtedness of nine million dollars there was to be three million five hundred thousand dollars of first mortgage bonds; three million three hundred thousand dollars of these bonds were to be used to complete and equip the road. The remaining two hundred thousand dollars of these bonds were to be deposited in the United States circuit court to secure and pay the preferred claims of creditors. A second mortgage bond issue of five million five hundred thousand dollars was to be made, five million dollars of this being used to take up by way of exchange the outstanding five million dollars of first mortgage bonds, and the remaining five hundred thousand dollars of these bonds were to be used to pay delinquent interest on the first mortgage bonds, and should this sum of five hundred thousand dollars not be sufficient for the purpose the old bondholders were to accept common stock at par in payment of the deficiency. Still further, five hundred thousand dollars preferred stock was to be issued and used to pay the claims of unsecured creditors, estimated at that time to be four hundred and twenty-five thousand dollars. Finally, the eight million five hundred thousand dollars' worth of common stock was to be issued and was to be disposed of as follows: Four hundred and twenty-five thousand dollars of it was to be given as a bonus to those persons providing the money enabling the committee to finance the cash bid secured by the Underwriter's Agreement; two million eight hundred and seventy-five thousand dollars was to go as a bonus to aid in selling the first mortgage bonds; one million three hundred and seventy-five thousand dollars was to pay coupons upon the second mortgage bonds, and the final three million eight hundred and twenty-five thousand dollars of this common stock was to be prorated amongst the stockholders of the old company. Finally the plan provided: "It is understood that the committee reserves to itself and shall have the right to change any of the provisions of this proposed plan to meet conditions as they arise, and the committee shall be the sole judge of the necessity and propriety thereof within the meaning of this clause."

A sale was so had upon January 17, 1911. The properties were purchased by the committee for the amount fixed in the court's order, the committee being the only bidder at the sale.

On February 1, 1911, the sale was confirmed.  On February 9, 1911, the committee executed a declaration of trust which set forth in full the agreement of July 29th, and declared that the committee held the properties purchased under that agreement.

From this time forth the committee busied itself actively in the matter of reorganization.  But the undisputed testimony is that all the overtures of the members of the committee looking to reorganization upon or along the lines of the plan of November 3d were utterly rejected by the financiers to whom they were submitted.  They said, "Ridiculous; we cannot consider it at all."  No outside capital could be allured into the enterprise.  And if confirmation be needed to the abundance of direct testimony establishing this, it is found in the fact that when the reorganization was effected by creating a corporation capitalized for five million dollars, the bondholders receiving stock in proportion to their bond holdings, an effort was made by this committee to place seven hundred thousand dollars bonds of this corporation—a corporation owning all of the property of the road, free from debt—and the committee with its best efforts was able to secure subscriptions for only about one-quarter of the proposed issue.  Having earnestly and unsuccessfully attempted to effect the reorganization in accordance with the plan of November 3d, the committee then endeavored to sell the property.  But all efforts to this end were equally unsuccessful.  These efforts continued through the spring and summer of 1911.  By September, 1911, the committee had become convinced that no inducements which they could offer would secure the investment of capital in the reorganization and rehabilitation of the road, and thereupon the members were confronted with a new situation fraught with danger to the interests which they represented.  The indebtedness to the Union Trust Company, to which reference has been made, which was secured by the Underwriter's Agreement, by the pledge of the bonds and by a deed of trust covering all the purchased properties, fell due on September 17th.  The trust company had positively declined to grant further extensions of time.  There was urgent need of work upon the road itself to prevent damage from the approaching winter storms, and to keep it up even to its imperfect condition of service.  Indebtedness for necessary equipment had been incurred by the

committee. The underwriters had announced that if they should be compelled to pay the trust company under their agreement they would immediately foreclose the lien which they had upon the properties of the road. A sale under this lien foreclosure would have swept away all the bondholders' rights without equity of redemption. From the date of the purchase the road had been operated by the committee, and the members of the committee had incurred personal responsibility and liability therefor. The situation, as summed up by defendant Moore of the committee, was this: "We simply were up against it; with the underwriters withdrawing; the bank not only not lending us more money, but notifying us to pay; we had no money and our condition was desperate."

Something had to be done, and the committee then proceeded with the organization of the Ocean Shore Railroad Company, the defendant in this suit. It was capitalized for five million dollars, divided into fifty thousand shares of the par value of one hundred dollars each. The committee conveyed all the property of the old railway company to the new corporation, receiving in return the agreement of the new corporation to issue its stock to those whom the committee might name. The committee directed the issuance of this stock to the old bondholders in amounts identical with the face value of their bond holdings. This was in December, 1911. On December 29th the committee executed a power of attorney to J. W. Crosby, authorizing him on behalf of the depositing bondholders to accept the shares of stock in the new corporation which were apportioned to these bondholders. Before doing this, in November, the committee passed a resolution declaring that it had found the plan of November 3d to be impracticable, and that it was the sense of the committee that it "should proceed to effect the most practicable and expeditious reorganization at the present time." The organization which we have last outlined is the organization which the members of the committee insist was not only the most practicable and expeditious reorganization, but absolutely the only reorganization which would preserve the bondholders' rights, and this by reason of the fact that the bondholders in purchasing the property through their committee had become the real owners of it, holding title (saving for the trusteeship in the committee) in the awkward and unmanageable condition of ownership in common. As such

owners, the property being impressed with a public duty, it was incumbent on them to see that by its operation it performed the purpose of its existence. It was useless for the committee to attempt to convey in severalty to each bondholder his proportionate share of the title. The simple, direct, expeditious, and only practicable course open to them was that which they adopted—that of organizing a corporation, capitalized for the exact amount of the bondholders' securities, and conveying to each bondholder in the form of stock the proportionate interest which he had in the properties. Thus was effectuated a legal and convenient means by which the bondholders themselves could operate the properties, or dispose of them, as they saw fit. In this connection the court found: "That if said committee had conveyed to each bondholder who had deposited his bonds with said committee, and which said bonds had been used in effecting the purchase of said properties, an undivided proportionate interest in the properties so acquired, the properties themselves would have been unmanageable, their value would have been destroyed, the franchises purchased by said committee could not have been availed of, and the interest of all said bondholders in said properties would have been entirely lost and destroyed; that it would have been impossible to have borrowed money for their operation or improvement, and that Union Trust Company of San Francisco would have proceeded, as it at that time threatened to do, to sell said properties, and to thus shut out and absolutely foreclose the rights of said bondholders in and to the said properties. That it was a fact that, unless money had been secured to pay said indebtedness to it, or assurances given to Union Trust Company of San Francisco that said indebtedness would be paid, said Union Trust Company would have sold, and that it then threatened to sell unless said payment was made, all said properties, and the rights of those who had deposited their bonds with said committee, in and to the said properties, would have been destroyed and rendered valueless. That said sale would not have been made subject to any redemption." There was pressing need for the payment of some of the indebtedness above mentioned. To meet this, a bond issue of the new corporation of seven hundred thousand dollars was authorized. It was hoped that the old bondholders themselves would take up this issue. The necessity of raising

this money was explained to them, as was also the whole plan
of reorganization. The old bondholders would not subscribe
for the new bonds. The most earnest efforts of the committee
succeeded in securing the wholly inadequate subscription of
two hundred and eighty thousand dollars.

Again the committee had failed, and was still confronted
with the danger of foreclosure by the Union Trust Company
or by the underwriters, and on January 18, 1912, the new cor-
poration levied an assessment of ten dollars per share upon
its stock. The assessment became delinquent on February
26, 1912. The sale day was March 18, 1912. Meetings of
the depositing bondholders were held from time to time, when
all of these matters were fully discussed and all the difficul-
ties laid before them. Such meetings were held on Decem-
ber 1, 1911, February 23, 1912, and March 12, 1912. At none
of these meetings did any bondholder raise any objection to
this reorganization. Discussion was had as to the practic-
ability of raising the money by a new bond issue substituted
for the assessment. Discussion was had as to whether the
assessment might not be reduced to five dollars per share.
The minutes declare that "the sense of the meeting was prac-
tically unanimous that the assessment should stand."

On March 16, 1912, two days before the sale day of the de-
linquent stock of the new corporation, this action was brought,
the principal contention of plaintiffs being, as heretofore out-
lined, that the agreement of July 29th is to be construed with
the approved proposed plan of November 3d, and that the
duties of the committee were therefore limited to an effort to
put the plan of November 3d in operation, that the trust so
declared became fixed and irrevocable, and if, for any reason,
the trust could not be performed, it became the duty of the
trustees either to surrender their trust to the bondholders, or
go into a court of equity and obtain their discharge.

We are now nearly, but not quite, in a position to discuss
this main contention. Certain matters preliminary to the
main consideration must first be treated and disposed of.
At the outset it is to be noted that the only rights involved
in this case are the rights of the plaintiff bondholders, who
alone are concerned in this litigation. Thus, assuming for
the moment that appellants' construction of the written in-
strument is the true one, we are here in no way concerned
with the rights of the stockholders or general or preferred

creditors under the agreement of November 3d. If that agreement be a contract for their benefit (Civ. Code, 1559) no one of them here appears to enforce his rights. The same is true of representations made by the committee to certain bondholders, which representations, it is asserted, confirm the agreement of November 3d and make it irrevocable. If this be true it did so only so far as those particular bondholders are concerned, and no one of these bondholders is here complaining. As to these plaintiffs, not parties to, and, so far as the record is concerned, not even aware of any of these stipulations, the representations or agreements were *res inter alios acta.* Still further it is to be pointed out that touching these plaintiffs and appellants themselves they are the owners of bonds aggregating four hundred and four thousand dollars face value. Four of the appellants, whose bonds aggregate one hundred and seventeen thousand four hundred dollars face value, never deposited their bonds at all, and therefore can by no possibility have any rights in this litigation. Thus bondowners of but two hundred and seventy-two thousand nine hundred dollars face value of the bonds may be heard to complain. Of this amount two hundred and twenty-four thousand four hundred dollars face value of the bonds were deposited under the signed agreement of July 29th before November 3, 1910, and therefore before the November 3d agreement came into existence. But forty-eight thousand five hundred dollars of these bonds were deposited after November 3d, and of these the owners of twenty-seven thousand five hundred dollars' worth accepted stock in the new railroad corporation defendant, and thus ratified the committee's acts and that reorganization. And there is no word of evidence disclosing that the bondholders to the small amount who deposited their bonds after November 3d, and who in doing so signed and signed only the agreement of July 29th, ever knew of the existence of the proposed plan of November 3d. And, finally, it is but proper to add, that while appellants contend that the result of the committee's abandonment of the plan of November 3d and of the reorganization actually effected by the committee was to work a fraud upon them, this fraud is in its nature a resultant rather than a designed fraud. The members of the committee were for the most part bondholders and stockholders. They were men of business prominence and financial standing. They gave their time without

compensation, and worked with unflagging zeal to bring about a happy solution of the business complications put under their charge. In the plan which they finally adopted and effectuated they entered and shared upon precisely the same terms as did all of the other bondholders. Their good faith is unquestionable, and indeed by the appellants is unquestioned. The dispute between the litigants thus arises wholly out of differing constructions put upon the committee's powers.

Thus we come again to the principal question in the case— the construction of those powers as between the complaining bondholders and their committee. No question arises, nor can arise, over the right of assenting bondholders to confer upon such reorganization committee substantially unlimited powers with unlimited discretion in the exercise of them. The bondholder ''may go further and agree in advance that his bonds shall be subjected to any plan of reorganization which the committee may adopt.'' (*Colonial Trust Co.* v. *Wallace*, 183 Fed. 897.) This is precisely what was done by the declaration of July 29th, which constituted the one and sole written authority to the committee signed by the bondholders themselves. Appellants contend that the agreement of July 29th must be construed with the approval of the proposed plan of November 3d, and to the doing of this there cannot be the slightest objection. But when appellants seek by their construction of the two agreements read together to have it said that the trust imposed in the committee became fixed, inelastic, and unchangeable, they do violence to the language as well as to the spirit expressed in the agreement of July 29th. That agreement was drawn, as appears from the face of it, and from the evidence touching its execution, with the design to confer upon the committee plenary powers, the bondholders recognizing the magnitude of the difficulties, and being more than willing to trust to the business ability and good faith of the members of the committee. Taking the two instruments together, what do they not mean? They do not mean, as appellants contend, that all of the important provisions of the agreement of July 29th touching the committee's rights and powers have been stricken out and eliminated, and that the committee was thus limited to the single effort of endeavoring to carry out the agreement of

November 3d. Reading the two agreements together and fairly construing them they amounted, at least so far as these bondholders, plaintiffs, are concerned, to nothing more than an agreement upon the part of the committee that it would first use its best endeavors to see whether an organization could be effected upon the plans and lines laid down in the November 3d agreement, with such departures therefrom as might be necessary to the accomplishment of this end; but that failing of ability to do this thing, there was still in reserve their broad powers to effectuate any other organization which in their judgment seemed to be best and for the best interest of the bondholders.

So the learned judge of the lower court construed this agreement, and in so construing it we think he was wholly right. There ceases to be, therefore, the slightest occasion for the review of the authorities, which, nevertheless, have been duly considered by this court. This is not the case of an agreement between bondholders and stockholders to the attempted exclusion of the rights of creditors who must be recognized if the stockholders are to be recognized. The bondholders have the unquestioned right, without regard to any of the equities of the stockholders or creditors, to foreclose their lien and bid in the properties. (*Miller* v. *Dodge*, 28 Misc. Rep. 640, [59 N. Y. Supp. 1074]; *Farmers' Loan & Trust Co.* v. *Green Bay & M. R. R. Co.*, 6 Fed. 110.) Moreover, as we have said before, neither the stockholders nor the creditors are here complaining. Nor yet is a reorganization whereby the old bondholders become the stockholders of the new railroad at all unusual. Indeed it is declared by the supreme court of the United States to be the best way of effecting such reorganization, "that is to say, reorganize the enterprise on the basis of existing mortgages as stock, or something which is equivalent, and by a new mortgage with a lien superior to the old, raise the money which is required." (*Shaw* v. *Little Rock etc. R. R. Co.*, 100 U. S. 612, [25 L. Ed. 757]; see, also, *White* v. *Wood*, 59 Hun, 619, [13 N. Y. Supp. 631]; *Gates* v. *Boston & N. Y. Airline Ry. Co.*, 53 Conn. 333, [5 Atl. 695]; *Somerset Ry.* v. *Pierce*, 88 Me. 86, [33 Atl. 773].) The cases cited and relied upon by appellants are quite unimpeachable in logic and law, but they are cases which deal with the rights of creditors when the bondholders

and stockholders have combined upon a reorganization to the exclusion of the creditors, or where the bondholders have agreed upon a plan of reorganization which defines the powers of the bondholders' committee and under which alone that committee can act, or, finally, where the reorganization agreement is to be formulated thereafter, with a reserved right to the depositing bondholders to withdraw from the agreement and take back their bonds, if within a limited time after the submission of the plan they are dissatisfied with it.   None of those cases touches the situation here presented, where the matter of the reorganization was wholly intrusted to the judgment of the committee.

What has been said concludes our review of the principal case.   One further matter, however, remains to be considered. Clara E. L. Folger was a party to the amended complaint, which alleged ownership by her of bonds of the face value of seventy-six thousand dollars.   Mrs. Folger had not deposited any bonds or signed any agreement.   They were deposited by her husband, who is not a party to this proceeding, and the agreement of July 29th was signed by him.   It was asserted that on August 28, 1912, Mrs. Folger purchased at the pledgee's sale five hundred bonds which had been held in pledge by the Wells Fargo Nevada National Bank of San Francisco.   These bonds had been deposited with the committee by that bank pursuant to the agreement of July 29th, and to a special agreement entered into between the bank and the committee.   During the trial Mrs. Folger asked leave to amend and set up the purchase of these bonds.   At the conclusion of the trial the court denied the motion.   Mrs. Folger's proposed amendment did not allege that the five hundred bonds referred to had ever been deposited by the bank or by Mrs. Folger with the committee.   This, in itself, justified the court's refusal in permitting the amendment. But moreover, if it be contended that Mrs. Folger in purchasing at the pledgee's sale acquired the alleged rights growing out of a special agreement of the committee with the bank, then it is manifest that the cause of action upon which Mrs. Folger relies is not the cause of action set forth by the plaintiffs, and that Mrs. Folger's sole redress would be by her own independent action; that she is not "a party similarly situated" with the other plaintiffs, within the meaning

of section 382 of the Code of Civil Procedure. The leave to amend was therefore properly denied.

The judgment appealed from is affirmed.

Shaw, J., Melvin, J., Sloss, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.